Sandy LOMBARDI, Plaintiff,

v.

Edward COSGROVE, et al., Defendants.

No. CIV. A. 96–1008.

United States District Court,
D. New Jersey.

Oct. 31, 1997.

James Segreto, Segreto & Segreto, Haledon, NJ, for Plaintiff.

Francis J. Vernoia, Genova, Burns & Vernoia, Livingston, NJ, for Defendant Cosgrove.

Courtney E. Redfern, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Defendant Passaic Valley Water Commission.

## OPINION

WOLIN, District Judge.

This case arises out of Sandy Lombardi's ("plaintiff"), allegations that Edward Cosgrove, defendant, of the Passaic Valley Water Commission ("PVWC"), defendant, created a hostile work environment and retaliated against her for filing an incident report after they had an argument. PVWC moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Cosgrove joins PVWC's motion and also files his own motion for summary judgment.

## BACKGROUND

The municipalities of Clifton, Passaic, and Paterson own the PVWC, which operates water works that supply potable water to the surrounding community. (Bella Aff. ¶ 2). The three municipalities appoint seven Commissioners to administer and set the policy for the PVWC. (Bella Aff. ¶ 3). Edward Cosgrove is one of the seven Commissioners. (Bella Aff. ¶ 4). Joseph Bella, Executive Director of the PVWC (Bella Aff. ¶ 1), and his professional staff and managers manage the PVWC's daily operations. (Bella Aff. ¶ 5). Plaintiff has been with the PVWC for eighteen years, and is now a principal account clerk/typist and secretary to Comptroller and Chief Financial Officer Carlos Alfaro. (Lombardi Aff. II ¶ 13; Lombardi dep. 7:9–10; Alfaro Aff. ¶ 1). She performs secretarial and accounting duties. (Lombardi dep. 7:14–16). Cosgrove has been known to refer to the PVWC as a Mickey Mouse operation. (Cosgrove dep. II 78:15–17; Meeting 71:2, 19).

In late 1993, Cosgrove and several other Commissioners decided to attend a League of Municipalities convention in 1994. (Cosgrove Aff. ¶ 3). Plaintiff was responsible for making the reservations and payment arrangements for the convention. (Cosgrove Aff. ¶ 3). In December 1993 and January 1994, Cosgrove spoke with plaintiff several times about the reservations. (Cosgrove Aff. ¶ 4). On those occasions, Cosgrove gave plaintiff specific instructions about the reservations. (Cosgrove ¶ 4). He told her to stop polling the Commissioners on whether they were going and to use the names he had given her, but she continued to call the Commissioners. (Cosgrove dep. II 97:9–12). Plaintiff received a different set of instructions on how to book reservations from Charlotte Alvino, the administrative secretary. (Lombardi dep. 117:11–13; 117:24 to 118:1–3).

Plaintiff and Cosgrove had different views on how to make the reservations. (Lombardi dep. 114:23–24). Plaintiff states that Cosgrove's instructions were in conflict with the New Jersey League of Municipalities procedures because he wanted her to just "book" rooms whereas the League's procedures require that reservations be made through the League. (Lombardi dep. 118:3; Lombardi Aff. ¶ 8). She also contends that Cosgrove instructed her to pick names at random whether or not the people were scheduled to go to the Convention. (Lombardi ¶ 8). Cosgrove asserts that plaintiff failed to follow her instructions. (Cosgrove Aff. ¶ 4). Plaintiff, on the other hand, responds that she initially made the reservations in accordance with the League's procedures, but later complied with Cosgrove's instruction to change the reservations. (Lombardi Aff. ¶ 9, 11).

On January 27, 1994, Cosgrove telephoned plaintiff to discuss the reservations. (Lombardi dep. 45:8). Plaintiff states that Cosgrove became upset about the way she was handling the reservations and began to raise his voice and shout at her, saying that she was doing her job incorrectly. (Lombardi dep. 53:18–25; Lombardi Aff. ¶ 12). Plaintiff asserts that Cosgrove wanted her to make reservations for people who were not going on the Convention. (Lombardi Aff. ¶ 12). Plaintiff avers that Cosgrove stated, "You don't fuckin' listen. You're getting suspended, God dammit. I'm sending you a memo and I'm giving you a five day suspension." (Lombardi dep. 50:9–11). Plaintiff also contends that Cosgrove told her she talked too much, called her an idiot, and stated, "No wonder John Galletta says you're no good." (Lombardi dep. 50:23–24; 56:13–14; Lombardi Aff. II ¶ 36).

During the conversation, plaintiff stated that she thought they were friends, but Cosgrove responded that he did not have any friends. (Lombardi Aff. II ¶ 21). Plaintiff states that Cosgrove used the word "God dammit" continuously and said "fuck" twice during the conversation. (Lombardi dep. 50:21). Plaintiff cried during the conversation and felt like she was having a heart attack. (Lombardi Aff. ¶ 12). Cosgrove stated that plaintiff did not start crying until the conversation ended. (Meeting 42:18–20).

The phone call lasted five to seven minutes and ended when plaintiff told Cosgrove that she was upset. (Lombardi dep. 63:6–21). Plaintiff then went to John Galletta's, the Personnel Director, office. (Alfaro Aff. ¶ 3; Lombardi Aff. II ¶ 29). She met with Galletta to tell him that she was upset from her

conversation with Cosgrove, but she could barely talk because she was so upset. (Lombardi Aff. II ¶¶ 23, 24).

She later went to see Alfaro about her problem with Cosgrove, which is the proper policy, and he took her home. (Lombardi Aff. II ¶ 24; Cosgrove dep. II 210:13–18). Alfaro also told plaintiff to put the contents of the conversation in writing so he could transmit it to the appropriate people. (Alfaro Aff. ¶ 4). After arriving home, she went to a doctor. (Lombardi Aff. II ¶ 27). The doctor prescribed a tranquilizer, told her not to work for a week, which she did, because of the stress from the incident. (Lombardi Aff. II ¶¶ 10, 27). She suffered from severe back pain, which arises when she is under stress. (Lombardi Aff. II ¶ 27). Most of the employees in the Clifton office knew about the conversation. (Cosgrove dep. 107:25 to 108:16).

After the conversation, Cosgrove called Alfaro to tell him that he had a problem with plaintiff. (Cosgrove dep. II 165:18–22). According to Alfaro, Cosgrove said that he was not going to "fucken apologize" to plaintiff. (Alfaro Aff. ¶ 3).[1]

At her deposition, plaintiff explained that Cosgrove's tone of voice and word choice were inappropriate because "that's man talk." (Lombardi dep. 56:17–25). She explained that "men talk to each other with that type of language. I don't think it is appropriate for a man to speak to a woman in that kind of language." (Lombardi dep. 60:21–24). She explained, "I know [fuck is] an every day thing, but I don't like it." (Lombardi dep. 58:8–9). In her affidavit, plaintiff added that she knows that men use the word "fuck" in their conversations, but that she did not think it was appropriate for Cosgrove to direct the word at a woman employee. (Lombardi Aff. ¶ 20). She also admitted that she used the phrase "dammit" infrequently. (Lombardi dep. 58:20–22). Cosgrove testified that it is not his practice to swear and that he never said the word

"fuck" to any employee at PVWC. (Cosgrove dep. III 55:18 to 56:1).

At the time of the conversation, Cosgrove was aware that the PVWC had a policy that no individual Commissioner had the authority to give a staff member an order. (Cosgrove dep. 82:24 to 83:8).

Prior to the conversation on January 27, 1994, plaintiff respected Cosgrove and considered him to be a friend because he had always been nice to her. (Lombardi dep. 309:19–22; 310:6–15). Plaintiff also states that at a political dinner prior to the telephone conversation, Cosgrove accused her of "brown-nosing" in front of Alfaro and other PVWC employees. (Lombardi Aff. ¶ 20; Lombardi dep. 341:6–10). Cosgrove apologized to her for making that comment at the office. (Lombardi dep. 341:19–22).

At her deposition, plaintiff admitted that she infrequently comes into contact with Cosgrove at work, and that since the conversation on January 27, 1994, he has not yelled at or been mean to her. (Lombardi dep. 330:12–17). She also claims that since the conversation, they do not talk too much. (Lombardi dep. 342:6–7).[2] In fact, she claims that he has not responded to her when she has said good morning to him. (Lombardi Aff. II ¶ 9).

Plaintiff considers Cosgrove to be a "toughie," and that it is not unusual to hear him yell at someone, but that she never heard him use the foul language he used with her with anyone else. (Lombardi dep. 331:21–25; Lombardi Aff. ¶ 23). Besides the conversation on January 27, 1994, plaintiff has never heard Cosgrove yell at a female employee, but she has heard him yell at at least five male employees. (Lombardi dep. 330:8 to 331:20).

On February 7, 1994, plaintiff submitted an incident report about the telephone conversation to Alfaro. (Redfern Cert. Ex. C). During the first week of February, plaintiff's

---

1. Cosgrove stated at his deposition that this comment was made during a meeting between him and Alfaro. Cosgrove ordered the meeting to discuss Alfaro's performance of distributing an unsigned memorandum. (Cosgrove dep. 45:8–16).

2. Plaintiff states in her affidavit that she and Cosgrove did not talk at all after the conversation. (Lombardi Aff. ¶ 22, 32). The Court uses the deposition because it provides greater safeguards for the truth than does an affidavit.

attorney sent a letter to the PVWC to comment on the inappropriateness of Cosgrove's conduct. (Lombardi dep. 362:8–12). Also, during that week, Alfaro circulated plaintiff's report to various Commissioners and PVWC employees. (Cosgrove Aff. ¶ 5). Lombardi claims that she distributed the memo to Galletta, General Counsel Thomas DeVita, Superintendent Wendell Inhoffer, and Bella. (Lombardi Aff. II ¶ 29).

Cosgrove was upset with Alfaro for distributing plaintiff's report, and according to Alfaro, Cosgrove changed his attitude towards plaintiff and him. (Alfaro Aff. ¶ 5). Cosgrove asked Bella to ask Alfaro why Alfaro had distributed a memorandum stating that he said that he would not "f'ing apologize" to plaintiff. (Cosgrove dep. 54:20–23). On February 10, 1994, Bella wrote Cosgrove a memorandum about a conversation he had with Alfaro pursuant to Cosgrove's report. The memorandum detailed Alfaro's reasons for distributing the letter. (Lombardi Aff. II, Ex. M). On February 11, 1994, Cosgrove submitted his own incident report about the conversation. (Lombardi Aff. II ¶ 53). Cosgrove believed that Alfaro exercised poor judgment because the comment about the apology was not relevant to plaintiff's claim. (Cosgrove dep. 132:6 to 13; 135:4–7). Alfaro concludes that since the conversation between plaintiff and Cosgrove, his relationship with Cosgrove and the Commission has transformed from pleasant and professional to hostile and confrontational. (Alfaro Aff. ¶ 5). Moreover, since the conversation, an attitude of hostility has been directed towards plaintiff, and people are hesitant to have contact with her. (Alfaro Aff. ¶ 10; Lombardi Aff. II ¶¶ 6, 31, 32).

On March 1, 1994, Cosgrove called a meeting at the Commissioner's office to discuss Alfaro's performance in distributing the report. (Cosgrove dep. III 28:10–11; Cosgrove Aff. ¶ 6). Cosgrove, Alfaro, Galletta, and DeVita, were present at the meeting, and Cosgrove opined that Alfaro exercised poor judgment in circulating the report because it was unsigned. (Cosgrove Aff. ¶ 6;

Alfaro Aff. ¶ 6; Meeting 7:7–18). Alfaro brought up plaintiff's name at the meeting, and Cosgrove stated, "I don't want to investigate with her. I want—I'll take care of her. That's not the issue." (Cosgrove dep. 28:12–13; Meeting 7:4–6). With regard to the report, Cosgrove stated, "It's nothing but a bunch of lies. That's not what happened . . . ." (Meeting 10:24–25).

He added that he would never apologize to her because of the difficult time she had given him. (Meeting 12:5–7). Cosgrove also said that Alfaro lied when he told plaintiff that Cosgrove stated that he would not "f'n apologize" to her. (Meeting 12:18 to 13:15). Cosgrove then explained that plaintiff twice ignored his instruction to call the hotels directly, and that when they spoke about the reservations, he told her "Damn you, shut up" and "God damn you, shut up" because she "kept talking and talking and talking." (Meeting 21:5–15; 42:13–17). He did state, however, that he never said the "f" word. (Meeting 21:21).

Later in the meeting, Cosgrove stated that he had never had a problem with anybody before the incident with plaintiff. (Meeting 53:13–14). With regards to plaintiff, he asserted, "I'm not here to bad-mouth Sandy Lombardi. Sandy Lombardi's reputation precedes itself. She's known here to be a talker . . . ." (Meeting 54:15–17). He added that plaintiff did not follow proper procedures when she went to a lawyer, and that she should have gone to the Personnel Office. (Meeting 64:2–13). With regards to using the "f" word, Cosgrove explained:

I don't use that word. Maybe [Commissioner] Alan Levine would, but I don't go around "F this" and "F that," and I got two daughters in my house, and we got a legitimate family, and I don't have somebody like Sandy Lombardi that if I investigate, her husband probably, and you can go back and tell her, probably committed suicide.

(Meeting 90:21 to 91:3). Cosgrove also stated that plaintiff was all over him at a Christmas party.[3] (Meeting 93:13–15). Galletta

**3.** Cosgrove admitted saying that she was all over me on one other occasion. (Cosgrove dep. 181:19–24). However, during a later deposition,

he testified that he never said that plaintiff was all over him. (Cosgrove dep. III 30:14–20).

also stated that plaintiff talks too much. (Meeting 94:10–12).

Cosgrove told the others at the meeting that he would quit tomorrow if the incident was not embarrassing because he does not need the "bullshit." He asked, "What the hell do I need this shit for?" (Meeting 97:16–20). Cosgrove also said that you can do anything at the PVWC. (Meeting 103:16–17). Finally, Cosgrove asserted that plaintiff could seek legal assistance because he had free legal advice from two qualified attorneys, and that it would not bother him if she filed a law suit. (Meeting 96:6–15).

Alfaro responded to Cosgrove's opinion and comments by stating that when a subordinate submitted a report, he had a duty to transmit it to superiors. (Alfaro Aff. ¶ 7). Plaintiff learned of the meeting one month later. (Lombardi dep. 134:9–10).

On March 7, 1994, Cosgrove submitted an incident report against Alfaro for exercising poor judgment. (Pl. Cntrstmt. of Undsptd. Facts ¶ 88). Plaintiff asserts that Cosgrove's comment about her husband implied that she drove him to suicide, when, in fact, he died from cancer. (Lombardi Aff. II ¶ 30). Cosgrove did not know plaintiff's husband and did not know if he committed suicide. (Cosgrove dep. 10:12–16; 12:4–5; 12:6–8). He testified at his deposition that he made the comment about the suicide because "she always kept talking forever." (Cosgrove dep. 12:20–22).

Alfaro assigns plaintiff her work, and he gave her a "very good" performance evaluation for 1995. (Lombardi dep. 213:25 to 214:1). Plaintiff maintains that her performance has remained excellent since the conversation, and that she continues to perform her duties despite the fact that her work environment has become hostile and different than it was before she filed her incident report. (Lombardi dep. 306:15–18; Lombardi Aff. ¶ 34). In fact, prior to and subsequent to the telephone conversation, plaintiff

has been evaluated as above average or as "exceeds standard." (Lombardi Aff. II, Ex. H).

The procedures for salary increases at the PVWC differ for union and non-union employees—salary increases for union employees are made through the collective bargaining process. (Bella Aff. ¶ 6). Plaintiff is not a member of the union because she became one of four confidential secretaries at the PVWC in 1990. (Bella Aff. ¶ 7).[4] She stopped paying dues to the union in 1990. (Lombardi Aff. ¶ 40). Other PVWC employees who are excluded from union membership include managers and executives. (Bella Aff. ¶ 8).

Prior to 1994, the PVWC generally gave its non-union employees the same salary increases as union employees. (Bella Aff. ¶ 9). In 1994, the Commissioners decided that the PVWC would no longer grant non-union employees the same percentage raises as union employees, and that increases for non-union employees would be determined separately. (Bella Aff. ¶ 9). At the time of the change in policy, non-union employees had received 5.5% increases for 1994. (Bella Aff. ¶ 10).

In March 1994, the Commissioners rescinded the 5.5% increase in salary that non-union employees inadvertently received, but the employees were allowed to keep the increase that they had received to that date. (Bella Aff. ¶ 11). Cosgrove admitted that he voted in favor of the rescission without seeing plaintiff's evaluation, and that he thought that the evaluation had not come to the Commissioners' attention. (Cosgrove dep. 148:12–16; 149:17 to 150:2; 152:19–24). In June 1994, the four confidential secretaries received 5.5% increases retroactive to the rescission in March. (Bella Aff. ¶ 12). Plaintiff alleges that this increase occurred as a result of a letter written by her attorney to the Commissioners. (Lombardi Aff. ¶ 49). Cosgrove voted in favor of increasing plain-

---

4. Plaintiff's assertions in her affidavits and in her deposition are inconsistent on whether she is a confidential secretary. In her affidavits, she states that she is not a confidential secretary, and that she did not receive that title until after the conversation and incident report. (Lombardi Aff. ¶¶ 38–39, 41; Lombardi Aff. II ¶ 15). How-

ever, she admits in her deposition that Galletta gave her the title of confidential secretary when she became Mr. Egan's secretary in 1990. (Lombardi dep. 17:12–22). She also testified that "I'm a confidential secretary trying to concentrate on confidential matters and also accounting." (Lombardi dep. 405:19–23).

tiff's salary by 5.5%. (Cosgrove Aff. ¶ 7). Thus, plaintiff did not suffer any loss of pay for 1994, but she claims to have suffered aggravation. (Lombardi dep. 372:3–4).

In December 1994, the Board of Commissioners promoted plaintiff. Cosgrove voted for the promotion. (Cosgrove Aff. ¶ 8). Plaintiff states that she received a change in title that was required by the Civil Service Regulations. (Lombardi Aff. ¶ 52).

On April 19, 1995, the Commissioners determined the 1995 increases for twenty-one non-union employees. (Bella Aff. ¶¶ 13, 14).[5] Commissioner Alan Levine and Personnel Committee Liaison proposed the raises, Commissioner Susan Jacubovic seconded the raises, and the seven Commissioners approved them. (Bella Aff. ¶ 13). Plaintiff received a 2.3% increase (Bella Aff. ¶ 14), but she asserts that the cap placed on her was retributive and that she should have received the 5% that union employees received. (Lombardi ¶ 54; Lombardi dep. 263:20–22). However, six employees received no increases and five, including plaintiff, received less than 5%. (Bella Aff. ¶ 14).[6] The PVWC had never before capped increases in salaries. (Cosgrove dep. 163:15–23).

The Commissioners capped plaintiff's and Rosemarie Filippone's, another confidential secretary, salaries "not due to employee[s] as individual[s] but rather because it was felt the salary for the position was too high." (Bella Aff. ¶ 15). Cosgrove voted for the cap based on that rational. (Cosgrove Aff. ¶ 11). Plaintiff claims that four Commissioners testified in another law suit that the salaries were not capped because they were too high. (Lombardi Aff. ¶ 63). Plaintiff avers that Commissioner Grecco told her that the reason for her salary cap was a "personality thing." (Lombardi Aff. II ¶ 40). She also states that Commissioner Sparano said that

she should have received the same salary increase as everyone else, and that she should not have been singled out. (Lombardi Aff. II ¶ 44). Commissioner Luchko told her that she should have gotten the increase, but disagreed that she had been singled out. (Lombardi Aff. II ¶ 45). Galletta and Alfaro told her that they did not think the cap was fair. (Lombardi Aff. II ¶ 41).

On May 26, 1995, plaintiff's counsel wrote the Commissioners a letter to state that the 2.3% cap increase on plaintiff's salary was illegal and discriminatory. He stated that the cap was, *inter alia,* retaliatory for filing the incident report against Cosgrove. (Lombardi Aff. II, Ex. D).

Two male employees received no salary increases for 1995 because their salaries had been capped the previous year. (Lombardi Aff. ¶ 58; Bella Aff. ¶ 16). At the time of the capping, plaintiff's salary was $36,408 and Filippone's was $39,682 whereas the other two confidential secretaries earned $33,893 and $28,500. (Bella Aff. ¶ 15). Plaintiff alleges that the other two confidential secretaries did not have the same seniority. (Lombardi Aff. ¶ 64). In early 1997, the Commissioners uncapped the salaries, and plaintiff received an increase, which made her happy. (Lombardi dep. 399:21–25; 404:6). Cosgrove was the only commissioner who did not vote to uncap the salaries. (Cosgrove dep. 177:9–12).

On June or July 2, 1995, plaintiff and fifteen other employees wrote the Commissioners a letter complaining about the salary increases, namely that two new employees received preferential treatment—they did not take the civil service examination because they were not Passaic County residents, started at a higher salary step, and received an additional raise. They wanted to know

---

5. Plaintiff claims that she was removed from union status as a response to the incident arising out of the telephone conversation. On April 18, 1994, a union representative wrote Bella a letter stating that he did not think plaintiff, Rosemarie Filippone, and Patricia McCann were confidential employees, and should, therefore, be in the union. (Lombardi Aff. II, Ex. C). On May 3, 1994, a union representative wrote Bella to state that plaintiff and Filippone did not possess confidential information about the collective bargain-

ing process, and should, therefore, receive union representation. (Lombardi Aff. II, Ex. B).

6. At her deposition, plaintiff did not know the reason why Imre Karasegi received an increase of less than 5%. (Lombardi dep. 397:21–23). However, in her affidavit, plaintiff states that there were only a few people who did not receive 5% increases, and they were part-time or new employees. (Lombardi Aff. ¶ 58).

why the rules were not applied uniformly. (Lombardi Aff. II, Ex. N).

On August 15, 1995, Bella responded to the letter. He wrote plaintiff that portions of the employees' letter were erroneous, the employees violated the grievance procedure, that union employees should have followed the union grievance procedures, and that the PVWC acted within its power. He stated that he would decide if disciplinary action was needed, and he sent a copy of the letter to plaintiff's personnel file. (Lombardi Aff. II, Ex. J).

"In approximately September 1994, the accounting, commercial and billing departments were moved 'downstairs' to a new addition to the PVWC offices." (Bella Aff. ¶ 17). The PVWC relocated the departments to consolidate the accounting and billing functions in one location easily accessible to PVWC customers. (Bella Aff. ¶ 17). Approximately twenty employees, including plaintiff, were moved. (Bella Aff. ¶ 17). Plaintiff claims that Inhoffer, Galletta, Alfaro, and Frank Munafo told her that she was getting her own office, but that Bella later told her that Cosgrove ordered that she receive a cubicle near the cafeteria instead. (Lombardi Aff. ¶ 71; Lombardi Aff. II ¶¶ 46, 47). In addition, plaintiff testified at her deposition that Cosgrove moved the departments "to get at us again." (Lombardi dep. 275:17–19). By us, plaintiff meant the department, her boss, and her. (Lombardi dep. 275:21–22).

Plaintiff claims that Cosgrove admitted to her that he ordered that she be moved to the other area. (Lombardi Aff. II ¶ 35). When plaintiff complained about the loss of her office, Cosgrove told her that they would build walls around her and that she would be confidential. (Lombardi Aff. II ¶ 35). In responding to plaintiff's complaint, Bella stated that there was nothing he could do and that she was getting "kicked out." (Lombardi Aff. II ¶ 48). Plaintiff also claims that James Gallagher told her that he thought she should get the office, but that Cosgrove made the decision and he was in charge of buildings and operations. (Lombardi Aff. II ¶ 35).

Plaintiff testified at her deposition that she objected to moving downstairs because the private office she was scheduled to receive was given to Pat Galdieri, a manager of the commercial and billing department. (Lombardi dep. 277:10–12; 268:24 to 269:3). Yitzhak Weiss, an accountant and CPA, later received the office. (Lombardi dep. 269:4–6; Bella Aff. ¶ 18). Both Galdieri and Weiss held positions superior to plaintiff, and Bella avers that he decided independently to give them the office. (Bella Aff. ¶ 18).[7] Plaintiff contends that neither Galdieri or Weiss should have a private office. (Lombardi dep. 346:24 to 347:19).

Cosgrove testified at his deposition that he spoke with Inhoffer and Bella about plaintiff's location because she was unhappy. (Cosgrove dep. 172:20–24). He stated that he tried to get the permission to build an office in the alcove in the foyer. (Cosgrove dep. 171:24 to 172:1). He denied making the decision to remove her from her office. (Cosgrove dep. 190:16–19).

Two of the four cubicles in plaintiff's cluster are occupied by the supervisor of collections and a senior clerk in the collections. (Lombardi dep. 406:20–407:13). A third cubicle is empty, but was formerly occupied by an accountant. (Lombardi dep. 279:7 to 17; 280:11–24).

On April 24, 1995, Alfaro responded to Gallagher's request about plaintiff's overtime. He described the work load that required plaintiff to work overtime. (Lombardi Aff. II, Ex. I).

During the pendency of this lawsuit, Cosgrove ordered that a table plaintiff was using be taken away from her because it had been taken out of the board room. (Cosgrove dep. II 31:6–21).

On January 25, 1996, plaintiff filed a Complaint in the Superior Court of New Jersey, Law Division, Passaic County. The Complaint contained Four Counts: (1) the treatment of her salary was retaliatory and discriminatory; (2) defendants' actions were

---

7. Plaintiff disputes this assertion, and states that Cosgrove made the decision. (Lombardi Aff. ¶ 76). In fact, she avers that Bella told her that Cosgrove made the decision. (Lombardi Aff. II ¶ 47).

retaliatory, intentional, and under color of state authority, caused mental anguish, and violated her civil rights; (3) Cosgrove defamed plaintiff; and (4) defendants created a hostile work environment and violated plaintiff's federal and state constitutional rights and federal and state statutory rights. Plaintiff seeks compensatory and punitive damages, counsel fees and costs, and any other relief that is equitable. Plaintiff also seeks punitive damages from Cosgrove.

Defendants removed the case to this Court. On July 31, 1996, the Court entered an Order dismissing Count One of the Complaint. The PVWC moves for summary judgment on Counts Two and Four pursuant to Rule 56 of the Federal Rules of Civil Procedure. Cosgrove joins that motion and moves for summary judgment on Count Three. PVWC also moves to strike plaintiff's affidavits pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7.2 of the New Jersey Federal Practice Rules ("Local Rules").

Plaintiff concedes that the Third Count should be dismissed. The statute of limitations for defamation claims in New Jersey is one year from the last defamatory statement. *See* N.J.S.A. 2A:14–3. Plaintiff admits that she filed her Complaint after the tolling period. Thus, the Court will dismiss Count Three, and will focus on Counts Two and Four. Those Counts include claims that defendants created a hostile work environment in violation of Title VII and the New Jersey Law Against Discrimination ("NJLAD"), that defendants violated § 1983 and the NJLAD by retaliating against her for complaining about Cosgrove, and intentional infliction of emotional distress.

## DISCUSSION

### 1. Standard for Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c); *see Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986). In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Whether a fact is "material" is determined by the substantive law defining the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *United States v. 225 Cartons,* 871 F.2d 409, 419 (3d Cir.1989).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *Id.*

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party has carried its burden of establishing the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the non-moving party's evidence in opposition to a properly-supported motion for summary judgment is merely "colorable" or "not significantly probative," the Court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

Further, when a non-moving party who bears the burden of proof at trial has failed, in opposition to a motion for summary judgment, to raise a disputed fact issue as to any essential element of his or her claim, summary judgment should be granted because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immateri-

al." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

In opposing summary judgment, a non-movant may not "rest upon mere allegations, general denials, or ... vague statements." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a nonmovant's] memorandum and pleadings are insufficient to repel summary judgment"); *see* Fed.R.Civ.P. 56(e). The summary judgment procedure enables a party "who believes there is no genuine issue as to a specific fact essential to the other side's case to demand at least one sworn averment of that [specific] fact before the lengthy process of litigation continues." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). The "unsupported statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Schoch,* 912 F.2d at 657.

An affidavit filed in opposition to a properly-supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A non-movant "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The Court is not to presume the existence of specific facts from general averments. *See id.* Such an affidavit must: (1) "show affirmatively that the affiant is competent to testify to the matters stated therein"; (2) be based on "personal knowledge"; and (3) establish facts that "would be admissible at trial". Fed.R.Civ.P. 56(e); *see Hlinka v. Bethlehem Steel Corp.,* 863 F.2d 279, 282 (3d Cir.1988). In sum, an affidavit offered in opposition to a motion for summary judgment must establish a proper evidentiary foundation for the facts stated

within it. *Williams v. Borough of West Chester,* 891 F.2d 458, 471 (3d Cir.1989) (Garth, J., concurring). Affidavits that fail to satisfy these requirements "may not be considered" on a motion for summary judgment. *Hlinka,* 863 F.2d at 282–83. Moreover, "[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991); *see also Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703 (3d Cir.1988).

### 2. Motion to Strike Affidavits

The PVWC's motion to strike plaintiff's affidavits is denied. "Affidavits are restricted to statements of fact within the personal knowledge of the affiant." N.J. Fed.R.Civ.P. 7.2(a). Affidavits should not contain arguments on the law or facts, and legal arguments and summations can subject a party to sanctions, censure, or both. *See id.* Moreover, affidavits made in bad faith or for the purpose of delay can subject a party to paying the legal fees of her adversary in responding to the affidavits, and a district court can hold a party or attorney in contempt. *See* Fed.R.Civ.P. 56(g).

Although many of plaintiff's statements are conclusory, beliefs, misstatements, or inconsistent, many of them are based on personal knowledge. The Court has decided to ignore conclusions, beliefs, and misstatements and to use only the assertions based on personal knowledge. Moreover, the Court attempted to clarify inconsistencies by examining the deposition abstracts and affidavits. However, the Court will strike Joseph Williams's letter because it is not in the form of an affidavit or certification.[8]

The Court cautions plaintiff's counsel that in the future, he should omit conclusory statements, misstatements, and personal beliefs from affidavits when they do not aid the

---

8. The letter provides the following information: in 1993, Cosgrove allegedly told Joseph Williams, former Assistant Personnel Director: "Sandy ... she talks too much... [sic] She's a fucking pain in the ass, and doesn't deserve that raise. If I hear from that fucking Pascrell about her, I'll tell him to go to hell too. I'm the Commissioner and [] I run this fucking place." Then, Cosgrove allegedly said, "If you don't fall in line with me, I'll get rid of you too." (Lombardi Aff. II, Ex. G).

Court's analysis. Extraneous statements make the Court's and the adversary's job more difficult.

The Court notes that PVWC's counsel has also interpreted certain facts to support its argument. The Court has used the factual statements, and not the PVWC's interpretation, to render its decision. The Court recognizes that PVWC's counsel has a duty to represent its client zealously, The Court advises PVWC's counsel that it should not cast aspersion on others when they are not innocent themselves.

### 3. Hostile Work Environment

#### a. Federal Law

■ 42 U.S.C. § 2000e-2(a) ("Title VII") prohibits public employers from discriminating against employees based on gender. A plaintiff who wants to sue under Title VII in federal district court must first pursue administrative relief, namely file a complaint with the Equal Employment Opportunity Commission ("EEOC"). *See Love v. Pullman Co.,* 404 U.S. 522, 523, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Trevino–Barton v. Pittsburgh Nat'l Bank,* 919 F.2d 874, 878 (3d Cir.1990). "Under the statutory scheme, no charge may be filed with the EEOC in a state … which provides an administrative remedy for discrimination until the charge is first filed with the state agency and either (1) sixty days elapses or (2) the agency terminates its proceedings." *Trevino–Barton,* 919 F.2d at 879 (citing 42 U.S.C. § 2000e-5(c)). NJLAD, N.J.S.A. 10:5-1 *et seq.,* contains a provision creating and empowering a Division on Civil Rights. N.J.S.A. 10:5-6. To pursue a claim under the NJLAD, a person may file a complaint either in the Superior Court of New Jersey or with the Division on Civil Rights. *See* N.J.S.A. 10:5-13. In this instance, plaintiff did not file a complaint with either the EEOC or the Division on Civil Rights. Thus, she has not exhausted her administrative relief and cannot sue in federal district court. The Court will, therefore, dismiss plaintiff's claim of hostile work environment that is based on Title VII.

#### b. State Law

N.J.S.A. 10:5-12 prohibits employment discrimination based on sex:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a. For an employer, because of the race, creed, color, national origin … sex … of any individual … to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment ….

■ In *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445 (1993), the Supreme Court of New Jersey defined the cause of action for a hostile work environment under the NJLAD. The Supreme Court held

that a plaintiff states a cause of action for hostile work environment sexual harassment when he or she alleges discriminatory conduct that a reasonable person of the same sex in the plaintiff's position would consider sufficiently severe or pervasive to alter the conditions of employment and to create an intimidating, hostile, or offensive working environment.

*Id.* at 592, 626 A.2d 445. Four elements comprise the cause of action of hostile work environment: "the complained of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a(3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*" *Id.* at 603–04, 626 A.2d 445.

■ The first element does not require a plaintiff to show that the defendant intentionally discriminated against her, but she must make a *prima facie* showing that the conduct occurred because of her sex; i.e., a plaintiff must show "that it is more likely than not that the harassment occurred because of the plaintiff's sex." *Id.* at 604–05, 626 A.2d 445. In non-facially sex-based harassment, a plaintiff can prove that the conduct occurred because of her sex by con-

necting it to sex-based comments or conduct, or by proving that only women suffered the harassment. *See id.* at 605, 626 A.2d 445. Although the second element can be found where only one incident occurred, the Supreme Court noted that the element will usually be met with numerous incidents or a pattern of conduct. *Id.* at 606–07, 626 A.2d 445; *see also Woods–Pirozzi v. Nabisco Foods*, 290 N.J.Super. 252, 270, 675 A.2d 684 (App.Div.1996) (stating that comments made frequently, not every so often, satisfied pervasive requirement). The third element is an objective and gender-specific test, which excludes the idiosyncratic response of a hypersensitive woman. *Lehmann*, 132 N.J. at 612, 614, 626 A.2d 445. Finally, a plaintiff only has to show that her working conditions have become hostile or abusive, but she does not have to show psychological harm or economic loss. *Id.* at 608–10, 626 A.2d 445.

In *Lehmann*, the plaintiff's supervisor, defendant Don Baylous, made comments about plaintiff's "tits" and "ass," and pulled the plaintiff's shirt above her head. *Id.* at 595–96, 626 A.2d 445. The plaintiff also noticed Baylous make offensive sexual comments and touchings on other women employees of defendant Toys 'R' Us. *Id.* at 595, 626 A.2d 445. Although the plaintiff complained about the conduct, Baylous did not stop acting inappropriately towards the plaintiff or other women; , *e.g.,* he told the plaintiff he would take advantage of her if she fainted. *Id.* at 596–97, 626 A.2d 445. The plaintiff continued to complain, but the management at Toys 'R' Us offered to transfer her and told her she was paranoid. *Id.* at 597–98, 626 A.2d 445. Eventually, the plaintiff resigned her position at Toys 'R' Us. *Id.* at 598, 626 A.2d 445. The defendants disputed the plaintiff's recitation of the facts. *Id.* at 598–99, 626 A.2d 445. Ultimately, the Supreme Court remanded for further findings of fact consistent with its opinion. *Id.* at 627, 626 A.2d 445.

■ Plaintiff's claim that defendants created a hostile work environment because of her sex fails because no reasonable trier of fact could conclude that Cosgrove would have acted differently if plaintiff was a male. This case is clearly one of non-facially sex-based conduct, and thus, plaintiff must link Cos-

grove's comments to sex-based comments or conduct or show that only women suffered from the harassment.

Plaintiff's claim rests on three basic allegations. First, Cosgrove asked plaintiff if she was brown-nosing at a political dinner. Second, during their conversation on January 27, 1994, Cosgrove used the words "fuck" and "Goddammit," he raised his voice during their conversation, called her an idiot and a liar, and said that Galletta said she was no good. Third, during the meeting on March 1, 1994, Cosgrove stated that plaintiff was a liar, that her husband probably committed suicide, that plaintiff's reputation as a talker preceded her, and that she was all over him at a Christmas party.

Accepting plaintiff's allegations as true, as the Court must, the Court finds that no genuine issue of material fact exists as to whether it is more likely than not that the conduct would not have occurred if plaintiff was a man. First, the brown-nosing comment does not lead to an inference of sexual discrimination because it could just have easily been made to a man. Second, the yelling is insignificant because plaintiff admits that Cosgrove yells at male employees. In addition, Cosgrove's comments that plaintiff is a liar, is no good, and talks too much have nothing to do with one's gender. Even though plaintiff states that she never heard Cosgrove use the words "fuck" and "Goddamit" with any other employees, she has not shown that the comments were made because she is a woman. In fact, plaintiff's affiant, Alfaro, averred that Cosgrove said "fuck" in a conversation with him following the one between Cosgrove and plaintiff. Thus, plaintiff has not shown that Cosgrove cursed because she was a woman. Third, the only comments made during the meeting that differ from the ones made during the conversation are that plaintiff was all over Cosgrove during a Christmas party and that she probably caused her husband to commit suicide. The suicide comment can be seen as a reference to a nagging wife, and the Court concludes that an inference can be made that that comment was made because of plaintiff's gender. The comment about the Christmas

party also shows that Cosgrove acted as he did because plaintiff was a woman.

The Court notes that the last two comments do not yield an inference that the other comments were gender based. The comments made during the telephone conversation and at the political dinner were made on different occurrences, and the comments made during the meeting contained content that could just as easily apply to a man.

■ Even if the comments about the Christmas party and the suicide are sufficient to satisfy the first element, plaintiff cannot satisfy the second, third, and fourth elements. Cosgrove's conduct is not pervasive because his two comments were made during one meeting. Furthermore, his conduct is not severe because plaintiff admitted in her deposition that Cosgrove was nice to her before the conversation, and that he rarely spoke to her after the conversation. Moreover, a reasonable woman would not conclude that those comments made her working conditions abusive or hostile. Even though the words "fuck" and "Goddammit" did not satisfy the first element, the Court notes that plaintiff's comment that men should not use those words in front of women evinces a hypersensitive attitude. Those words are indeed "curse" words, but a reasonable woman would not conclude that a supervisor's use of those words on one occasion make a working environment hostile or abusive. Thus, the Court concludes that plaintiff has failed to meet essential elements of her cause of action and will, therefore, grant summary judgment for defendants on this claim.

The Court will not address plaintiff's allegations that defendants violated her state constitutional rights because she has not shown that defendants' decision concerning her were made because of her gender. More importantly, she has not shown that defendants gave a benefit to a male employee instead of her. *See Peper v. Princeton Univ. Bd. of Trustees,* 77 N.J. 55, 82–85, 389 A.2d 465 (1978) (explaining that cause of action for employment discrimination under Article I, paragraph 1 of New Jersey Constitution required same elements as those found in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

### 4. Retaliation

Plaintiff asserts that Cosgrove retaliated against her for filing an incident report against him. Namely, plaintiff states that following the submission of her report, Cosgrove moved her downstairs, took away her private office, gave her a lower raise than that given to union employees, capped her salary, and took away her desk.

#### a. Federal Law

■ 42 U.S.C. § 1983 prohibits public officials from restricting individuals from exercising their individual rights:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim under § 1983, a plaintiff must show that (1) defendants deprived her of a right secured under the Constitution or laws of the United States, and (2) that such deprivation occurred under color of state law. *See, e.g., Paul v. Davis,* 424 U.S. 693, 696–97, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

■ Public employees do not lose their First Amendment rights to comment on matters of public concern because of their employment. *See Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In fact, public employees are protected when they speak privately to their employer as well as when they speak to the general public. *See Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (remanding to determine whether School District would have rehired employee but for her comments). However, public employers have a greater interest in regulating the speech of its employees than it does in gov-

erning the speech of the citizenry. *Id.* Thus, the test for determining whether a public employer has retaliated against a public employee is more demanding than the normal § 1983 claim. The test contains three elements: (1) the plaintiff must show that she was engaged in a protected activity; (2) if the activity was protected, then she must show that the activity was a substantial or motivating factor for the employer's action; (3) if the plaintiff meets the first two requirements, the defendant has the opportunity to show that it would have taken the same action if the plaintiff had not engaged in the protected activity. *See, e.g., Swineford v. Snyder County Pa.,* 15 F.3d 1258, 1270 (3d Cir.1994) (citations omitted).

A public employee's speech is protected by the First Amendment only if relates to a matter of public concern; *i.e.,* "any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Courts should determine whether speech is of public concern by examining the content, form, and context of a given statement. *See id.* at 147, 103 S.Ct. 1684. Complaints about a public agency's misfeasance, internal operations, or administration are protected speech, but speech to an air a personal grievance is not. *See Swineford,* 15 F.3d at 1271 (citations omitted). If a Court concludes that the speech is of public concern, then it should examine whether the "government's interest in the effective and efficient fulfillment of its responsibilities to the public" justified the restriction on the employee's right. *See Connick,* 461 U.S. at 150, 103 S.Ct. 1684. As stated in *Pickering, supra,* courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. 1731.

Although the PVCW was willing to concede that plaintiff's speech was protected for the purposes of this motion, the Court finds that that issue is dispositive for this motion and rests its decision on that ground without addressing the other components of the test.[9] Plaintiff claims that defendants retaliated against her for registering a complaint about Cosgrove's conduct, but she has failed to establish a genuine issue of material fact that her speech was a matter of public concern. Plaintiff's report expressed her dismay at the tone and content that Cosgrove used during their conversation. She did not, however, complain about the administration of or the service provided by the PVCW. The Court, therefore, finds that plaintiff's report is a private grievance and does not rise to the level of constitutionally protected speech. As the Supreme Court stated in *Connick,*

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at 147, 103 S.Ct. 1684. Thus, the Court will grant defendants' motions for summary judgment on this claim because plaintiff has not met the first element for a cause of action under § 1983.

**b. State Law–NJLAD**

N.J.S.A. 10:5–12(d) protects employees who complain about or oppose practices or conduct prohibited under the NJLAD:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

> d. For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other per-

---

**9.** A discussion on whether defendants retaliated against plaintiff is, however, presented in the next section.

son in the exercise or enjoyment of, any right granted or protected by this act.

 To establish a claim of retaliation under the NJLAD, a plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in a protected activity known to the employer; (2) following the protected activity, the employer made an adverse employment decision towards her; and (3) a causal link exists between the two. *See Jamison v. Rockaway Tp. Bd. of Educ.*, 242 N.J.Super. 436, 445, 577 A.2d 177 (App.Div. 1990) (citation omitted). A causal link can be found even if time elapses between the protected activity and the adverse employment decision. *See Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J.Super. 543, 544, 665 A.2d 1139 (App.Div.1995). If the plaintiff establishes a *prima facie* case, the burden of going forward shifts to the employer to articulate a legitimate, non-retaliatory reason for the employment decision. *See Jamison*, 242 N.J.Super. at 445, 577 A.2d 177 (citation omitted). If the employer states such a reason, the plaintiff must show by a preponderance of the evidence that a discriminatory intent motivated the employer's decision. *Id.* (citation omitted). On motions for summary judgment, the plaintiff accomplishes the rebuttal by pointing

> to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.... [T]he non-moving party must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence."

*Romano*, 284 N.J.Super. at 551, 665 A.2d 1139 (quoting *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir.1994)). After the plaintiff succeeds in rebutting the employer's reason, "the employer must prove by the preponderance of the evidence that the adverse action would have been taken regardless of retaliatory intent." *Jamison*, 242 N.J.Super. at 445–46, 577 A.2d 177.

 Plaintiff has established a *prima facie* case. First, plaintiff's incident report is a protected activity under the NJLAD because plaintiff thought that Cosgrove was discriminating against her because she was a woman. Second, plaintiff claims that her office was taken away from her, that her department was moved downstairs, that she did not receive the correct salary increase, that her salary was capped, and that a desk was taken away from her. Finally, plaintiff has created a genuine issue of material fact that the protected activity is the cause for the adverse employment decisions because they were all made after the protected activity occurred.

 Defendants has satisfied its burden of providing a legitimate, non-discriminatory reason for the adverse decisions. Cosgrove testified at his deposition that the table was removed because it was taken out of the boardroom, that the salary was capped to keep salaries down, and that many people did not receive the raise the union received. Moreover, defendants provided evidence that Cosgrove was not involved in the decision to take away plaintiff's office, and that the move downstairs involved several departments.

 Plaintiff's rebuttal about the salary presents a genuine issue of material fact as to whether Cosgrove retaliated against her. Plaintiff avers that Commissioners Grecco told her she did not receive the full increase because of "a personality thing," that Commissioner Sparano said that she should not have been singled out, and that Commissioner Luchko told her that she should have gotten the increase. On the other hand, eleven out of twenty-one employees received less than the union's salary increase, and no direct evidence exists to show that Cosgrove tainted the process by which salary determinations were made. In reaching its decision, the Court has not considered plaintiff's assertion in her affidavit that four Commissioners testified in another case that the salaries were not capped because they were too high because she has failed to produce the deposition transcripts or the names of those Commissioners. The Court concludes that a rational jury could determine that plaintiff's salary was capped because of the incident report.

The Court also concludes that plaintiff has established a genuine issue of material fact that Cosgrove ordered that her office be taken away in retaliation for filing the incident report. Plaintiff avers that Bella and Gallagher told her that Cosgrove ordered that she should not receive a private office, and that Cosgrove admitted to giving the order. On the contrary, Bella avows that he made the decision independently, and Cosgrove testified that he did not make the decision. Thus, the Court concludes that a reasonable jury could infer that Cosgrove made the decision in retaliation to the filing of the incident report.

The Court will not address the taking of the table because plaintiff has not offered any rebuttal to Cosgrove's reason. The Court will also not examine plaintiff's claim that her constitutional rights were violated because of its conclusion that her claim under the NJLAD is sufficient to defeat defendants' motion for summary judgment. *See Craig v. Suburban Cablevision, Inc.,* 274 N.J.Super. 303, 314, 644 A.2d 112 (App.Div. 1994), *aff'd,* 140 N.J. 623, 660 A.2d 505 (1995); *see also Drinkwater v. Union·Carbide Corp.,* 904 F.2d 853, 863–64 n. 21 (3d Cir.1990) (doubting that cause of action for retaliation exists under New Jersey Constitution).

### 5. Intentional Infliction of Emotional Distress

To establish a claim of intentional infliction of emotional distress, a plaintiff must prove that (1) the defendants' conduct was intentional and outrageous, (2) the defendant proximately caused plaintiff's injuries, and (3) plaintiff's distress is severe. *See Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 366, 544 A.2d 857 (1988) (citation omitted).

"The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 366, 544 A.2d 857 (quoting Restatement (Second) of Torts § 46 comment d.). In *Subbe–Hirt v. Baccigalupi,* 94 F.3d 111, 114 (3d Cir.1996), the Third Circuit found that plaintiff's employer and supervisor had engaged in outrageous conduct when the supervisor intimidated, berated, badgered, and coerced

plaintiff because he wanted to force her out of the company. *Id.* at 114–15. Moreover, after the plaintiff submitted a doctor's report stating that she should not be subject to stress, defendant specifically targeted plaintiff's weakness. *Id.* at 115. Thus, the panel reversed the district court's order granting summary judgment to defendants. *Id.* at 114.

A rational jury could determine that Cosgrove's comment about plaintiff's husband committing suicide is extreme and outrageous. Losing a spouse to an early death from a painful disease like cancer is a painful experience. Cosgrove's comment that plaintiff's husband committed suicide because plaintiff talked too much and nagged him could reopen her emotional scars. Thus, a jury could conclude that the comment is outside the bounds of decency.

The third element for a claim of intentional infliction of emotional distress requires a showing that "the mental distress is so severe that no reasonable man could be expected to endure it." *Buckley,* 111 N.J. at 368, 544 A.2d 857. In *Buckley,* the plaintiff testified that he suffered from aggravation, embarrassment, an unspecified number of headaches, and loss of sleep. *Id.* at 368, 544 A.2d 857. The Supreme Court ruled that that evidence did not prove that the mental distress was severe because, *inter alia,* he did not describe the frequency of headaches, and did not complain that his every day routine was disrupted. *Id.* at 368–69, 544 A.2d 857; *see also Lingar v. Live–In Companions, Inc.,* 300 N.J.Super. 22, 35, 692 A.2d 61 (App.Div.1997) (affirming summary judgment on intentional infliction of emotional distress where plaintiffs claimed that they were extremely traumatized by defendants' employee's actions).

Plaintiff has not produced any evidence to show that she suffered severe distress from the comment about the suicide. Plaintiff sought medical treatment for a headache and lower back pain following the telephone conversation between Cosgrove and plaintiff on January 27, 1994. The Court notes that that evidence would not satisfy the standard established in *Buckley.* In any event, plaintiff has failed to show that she suffered any distress from the comment

about her husband's suicide, and therefore, the Court will grant summary judgment on this claim in favor of defendants.

## 6. Subject Matter Jurisdiction

The only claim that remains arises out of the NJLAD. Pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court will remand this case to the Superior Court of New Jersey, Law Division, Passaic County, because it no longer has subject matter jurisdiction.

## CONCLUSION

Thus, the Court will deny defendants' motion to strike plaintiff's affidavits and will deny defendants' motion for summary judgment on the retaliation claim. The Court will, however, grant summary judgment on the hostile work environment and the intentional infliction of emotional distress claims. In addition, the Court will dismiss with prejudice the defamation claim. Finally, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, the Court will remand this action to the Superior Court of New Jersey, Law Division, Passaic County, because it no longer has subject matter jurisdiction.