Roberto RODRIGUEZ, Plaintiff,

v.

Rolando TORRES, Jr., individually and in his capacity as Director of the Division of Civil Rights, Defendant.

No. CIV. A. 97–3765 (MLC).

United States District Court,
D. New Jersey.

June 30, 1999.

Stephen M. Latimer,Loughlin & Latimer, Hackensack, NJ, for Plaintiff.

Jeffrey Burstein, Deputy Attorney General, Office of New Jersey Attorney General, Division of Law, Newark, NJ, for Defendant.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on defendant Rolando Torres's ("Torres") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons expressed below, the motion is granted in part and denied in part.

### BACKGROUND

This litigation stems from plaintiff Roberto Rodriguez's ("Rodriguez") employment with the New Jersey Division on Civil Rights ("DCR"), the New Jersey state agency which enforces the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. ("N.J.S.A.") § 10:5–1 *et seq.* Rodriguez claims that defendant Torres denied plaintiff a promotion to the position of "Administrative Analyst 1" in June 1997 and subjected plaintiff to a "hostile work environment" because of plaintiff's involvement in the following activities: (1) an organization called the Hispanic Council of New Jersey ("HISPAC"), (2) administrative complaints filed by HISPAC against various state agencies, and (3) "his civil rights and political activities on behalf of Hispanic people." (Am. Compl., Count I ¶ 39 (denial of promotion), Count II ¶ 44 (hostile work environment).) Plaintiff has instituted this suit pursuant to 42 U.S.C. § 1983, alleging that defendant's retaliatory conduct (i.e., the denial of the promotion in June 1997, and the creation of a hostile work environment) violated plaintiff's First Amendment right of free speech and association.

Plaintiff's Amended Complaint also asserts pendent state claims under the free speech and petition provisions of the New Jersey Constitution, (*id.* Count III (citing Article I, ¶¶ 6, and 18 of N.J. Const.)), and the anti-retaliation provision of the NJLAD. (*Id.* Count IV (citing N.J.S.A. § 10:5–12(d)).)

The facts presented to the Court in connection with this motion are abundant, and we will highlight only those which we find germane to the disposition of this matter.[1] Plaintiff began his employment with DCR in 1986. Defendant and plaintiff became acquainted with one another in or around the summer of 1986 at a HISPAC function. (Torres Dep. at 18; Rodriguez Dep. I at 86–87.)

Defendant Torres has been the Director of DCR since September 1995. From July 1990 to September 1995, Torres held the position of Assistant Director of DCR in charge of the "Bureau of Enforcement." (Torres Aff. ¶ 1.) Prior to Torres's appointment as Director of DCR in 1995, HISPAC was involved with the appointment of a new Director of DCR for the Whitman administration. (Torres Dep. at 99.) HISPAC advocated for the appointment of an individual of Hispanic national origin. (*Id.*; Rodriguez Dep. I at 127.) Eventually, after HISPAC's lobbying efforts, Torres was appointed to the position. Torres

is of Hispanic national origin; he was born in Puerto Rico. (Torres Aff. ¶ 4.)

Prior to Torres's appointment as Director, HISPAC filed administrative complaints before DCR in April 1995 against 30 New Jersey agencies and officers alleging broad-based discrimination against Hispanics in hiring and promotions. DCR was not one of the state agencies charged as a respondent. Rodriguez, as secretary/treasurer of HISPAC, was an individual complainant in the HISPAC litigation.

Currently, Rodriguez holds the title of "Administrative Analyst 2" with DCR, a position that he has held since January 1993. As an Administrative Analyst 2, plaintiff was in charge of one aspect of DCR's computer operations, the "case tracking system," which involved docketing of administrative complaints filed with DCR. (Rodriguez Dep. II at 32; Torres Aff. ¶ 9.)

Shortly after becoming DCR Director, Torres decided to coordinate the separate computer operations of DCR. The implementation of the structural change coincided with a leave of absence requested by plaintiff which was to begin on December 1, 1995. During plaintiff's leave of absence, plaintiff sought employment in Arizona. He received an interview for a position, but did not obtain a job offer.

---

1. The Complaint in this case was filed on July 29, 1997. Plaintiff's brief in opposition to defendant's motion provides more recent factual information regarding plaintiff's employment relationship with DCR, conduct by Torres, and plaintiff's HISPAC-related activities which we will not repeat herein. (*See, e.g.,* Pl.'s Br. in Opp'n at 22–23.) Plaintiff has not stated that he will attempt to rely upon a continuing violation theory, and we will not engage in the analysis of whether he could do so at this time. *See Vearling v. Bensalem Township Sch. Dist.,* No. 94–7711, 1997 WL 128096, at *8 (E.D.Pa. Mar.18, 1997) (addressing continuing violations theory as applied to § 1983 and Title VII retaliation cases). To the extent that plaintiff's papers highlight information which occurred outside of the limitations period or after the Complaint in this case was filed, we will not

consider those events as the substantive basis for plaintiff's retaliation claims. *See Hurley v. Atlantic City Police Dep't,* 174 F.3d 95, 109–12 (3d Cir.1999); *see also Hurley v. Atlantic City Police Dep't,* 1995 WL 854478, at *10 (D.N.J. Aug.4, 1995) (limiting plaintiff's § 1983 retaliation claims to actions occurring within statutory time period). Of course, the information presented may be admissible and relevant on the issue of defendant's motive or intent, despite the fact that the conduct is not independently actionable. *See Vearling,* 1997 WL 128096, at *8 & n. 17 (citing *inter alia, Glass v. Philadelphia Elec. Co.,* 34 F.3d 188, 195 (3d Cir.1994)); *Hurley,* at 111–12 (discussing relevancy of certain evidence of discrimination which was temporally remote from conduct which formed basis for liability). We decline to make any rulings on that issue at this time.

When plaintiff began his leave of absence, Torres assigned Ralph Menendez to operate and manage the case tracking system formerly managed by plaintiff, in addition to Menendez's computer-related responsibilities at DCR. In May 1996, while plaintiff was on leave, Torres decided to consolidate the various computer functions and put them under Menendez's control on an interim basis. Unlike the previous structure, Menendez, as a manager of the unit, reported directly to Torres.

Plaintiff extended his leave beyond the initial six month time period, and returned to DCR in October 1996. Plaintiff returned to his position as Administrative Analyst 2, at a salary higher than when he left for his leave of absence.

Meanwhile, at various points in 1996, all the state respondents in the HISPAC litigation moved for dismissal. On March 3, 1997, Torres granted respondents' motions without prejudice. On April 21, 1997, HISPAC filed a Notice of Appeal of Torres's dismissal with the New Jersey Superior Court, Appellate Division. That same day, HISPAC held a press conference concerning DCR's dismissal of the HISPAC complaints, which took place at the State House at 11:00 a.m.

Plaintiff wanted to attend the press conference. In order to enable him to do so, plaintiff informed Torres's secretary that he would take his lunch hour early that day. Torres became aware that plaintiff took an early lunch hour to attend the press conference. When plaintiff returned to the office, Torres told plaintiff that he could not take an early lunch hour to attend non-agency political-type work without using vacation time. Torres indicated that plaintiff's actions contravened state policy. Accordingly, plaintiff applied for the use of vacation time for his attendance at the meeting and Torres approved plaintiff's request. (Torres Aff. ¶ 8(b).)

In or about the Spring of 1997, Torres implemented the reorganization of DCR's computer functions by creating a new employment position to oversee and coordinate the operations which Menendez had been performing on a temporary basis since May 1996. Torres posted a "notice of unclassified job vacancy" on May 13, 1997 for the position of "Administrative Analyst 1." Four DCR employees applied for the position: (1) plaintiff; (2) Menendez; (3) Nancy Castro; and (4) Bernice Green. Torres decided to interview the first three candidates for the position.

Because of the restructuring undertaken while plaintiff was on leave, plaintiff's day-to-day responsibilities were different than they had been prior to his leave of absence. (Rodriguez Decl. ¶ 6.) Upon plaintiff's return, Menendez assigned plaintiff to two computer-related assignments on or about November 8, 1996. The evidence reveals that plaintiff had problems completing the assignments in a timely fashion. (Rodriguez Dep. at 110.) It appears that Menendez was experiencing problems communicating with plaintiff concerning the timely completion of the two projects assigned to him. Finally in or around the second week in May 1997, Menendez and Torres met to discuss plaintiff's failure to complete the assignments given by Menendez in a timely manner. (Menendez Dep. at 78–79.) At that time, plaintiff had just completed one of the projects assigned to him.

Plaintiff met with Torres, John Superak, Menendez and plaintiff's union representative on May 29, 1997 to discuss plaintiff's problems in completing the assignments. (*Id.* at 83.) At the time of the meeting, there was either perceived or real tension between plaintiff and Menendez. (Torres Dep. at 135.) Plaintiff testified at his deposition that he told Torres that he felt as if he were being retaliated against because of his membership in HISPAC; Torres assured him that he was not being mistreated. (Rodriguez Dep. III at 29–38; *see also* Torres Dep. at 133–141.) Plaintiff also stated that Torres indicated to plaintiff that he was unhappy with plaintiff's attitude and conduct since plaintiff re-

turned from leave. Torres indicated his displeasure with the tone of a memorandum written by plaintiff and directed to Menendez earlier in May 1997. (Rodriguez Dep. III at 37–40; Torres Dep. at 133.)

Approximately one week later on June 5, 1997, the interviews for "Administrative Analyst 1" took place. Dean Deakins, Manager of Data Processing Services of the Department of Law and Public Safety, and Katrina Wright, DCR Assistant Director for Community Relations, conducted the interviews on Torres's behalf. After interviewing the three candidates, Deakins and Wright agreed that Menendez was the best qualified candidate, and recommended to Torres that Menendez be selected. (*See* Wright Aff. ¶ 2; Deakins Aff. ¶ 3; Deakins Aff., Ex. 1.) Consequently, Torres selected Menendez for the position of Administrative Analyst 1. This employment action forms the basis of Count I of plaintiff's Amended Complaint.

Torres articulated three reasons for selecting Menendez for the position. First, Torres relied upon the unanimous recommendation of Deakins and Wright. Second, Torres believed that Menendez was superior to plaintiff in his ability to develop and utilize computer software and create a linked comprehensive information system for DCR. Finally, defendant believed that Menendez had superior abilities to plaintiff in managing employees and in interacting with other DCR managers. (Torres Aff. ¶ 12.)

Plaintiff alleges in addition to the promotion issue, that he was subjected to a "hostile work environment" at DCR because of his affiliation with HISPAC. At his deposition, plaintiff pointed to the following conduct in support of his theory that he was subjected to a hostile work environment in retaliation for his affiliation with HISPAC: (1) plaintiff did not receive a performance assessment review ("PAR") for an extended period of time upon his return from leave, (Rodriguez Dep. II at 106); (2) certain persons in DCR management treated plaintiff differently in that they would not return plaintiff's greetings in the hallways, (*id.* at 115, 116); (3) defendant commented to plaintiff upon his return from leave on October 15, 1996 that defendant did not feel that plaintiff "fit in his organization" because of the changes that were implemented in plaintiff's absence, (*id.* at 118); and (4) defendant asked plaintiff during that same meeting how much longer plaintiff thought he would be "around" and that it would probably be better for plaintiff to look for a job outside DCR. (*Id.* at 130–31.) Plaintiff also points to the fact that his job responsibilities were different upon his return from leave. (Rodriguez Aff. ¶ 6.) Count II of plaintiff's Amended Complaint is predicated on his theory of "hostile work environment" under § 1983, and because the claim is presented to us in that manner, we will analyze the proofs pertaining to that issue separately from the issue raised by the failure to promote plaintiff.

Defendant has filed the instant motion for summary judgment, arguing that the Court should dismiss plaintiff's Amended Complaint in its entirety. Each of defendant's arguments will be discussed in detail below. Our analysis of plaintiff's claims articulated in the Amended Complaint will follow the following structure. We will first address the viability of plaintiff's retaliation claim under § 1983 premised upon defendant's failure to promote plaintiff to Administrative Analyst 1. Next, we will consider whether and under what circumstances a plaintiff may bring a "hostile work environment" cause of action under the analytical framework developed in the context of a § 1983 retaliation claim, and also whether plaintiff is entitled to qualified immunity for that claim. Finally, we will consider the viability of plaintiff's pendent state law claims pursuant to NJLAD and the New Jersey Constitution.

## DISCUSSION

A court shall enter summary judgment under Federal Rule of Civil Procedure 56 when the moving party demonstrates that

there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to defeat a motion for summary judgment, the opposing party must establish that a genuine issue of material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). A nonmoving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505.

*I. Retaliation Claims Pursuant to 42 U.S.C. § 1983—General Principles*

▬ A public employee alleging an adverse employment action because he engaged in First Amendment protected activity must demonstrate the following elements: (1) the employee engaged in protected activity, and (2) the protected activity was a substantial or motivating factor for the adverse action taken by the employer. *See Fultz v. Dunn*, 165 F.3d 215, 218 (3d Cir.1998); *Swineford v. Snyder County*, 15 F.3d 1258, 1259 (3d Cir. 1994) (applying *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If

the plaintiff satisfies the first two prongs, the defendant can escape liability by showing that he would have taken the same action absent the protected activity. *Fultz*, 165 F.3d at 218.

Defendant appears to concede for purposes of this motion that plaintiff's involvement in HISPAC amounts to protected First Amendment activity. (Def.'s Br. in Supp. at 19 n. 9.) The parties' positions diverge, however, as to the exact conduct by plaintiff which allegedly formed the basis for Torres's retaliatory actions. We will assume for purposes of this motion that plaintiff has engaged in protected First Amendment conduct, as it does not appear that the parties dispute this point.

The next element of the plaintiff's retaliation claim is that the plaintiff must have suffered from some adverse action by his or her employer as a result of engaging in protected speech or association. *See Fultz*, 165 F.3d at 218; *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir.1997) (plaintiff must demonstrate that government responded to plaintiff's First Amendment protected activity with retaliation); *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir. 1996) (plaintiff must demonstrate that the protected activity was a substantial or motivating factor in the alleged retaliatory action). With respect to plaintiff's two claims at issue here, Count I alleges that defendant denied plaintiff a promotion. Count II is predicated on the theory that defendant subjected plaintiff to a hostile work environment.

▬ The third element of plaintiff's prima facie case is that of causation.[2] "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."

---

**2.** In describing the causation inquiry we must perform, we have relied in part upon cases within this circuit which have addressed that issue in the context of Title VII retaliation claims. It is clear that the causation inquiry is essentially the same in the context of the First Amendment retaliation suit under § 1983 as it is in Title VII cases. *See Azzaro*

*v. County of Allegheny*, 110 F.3d 968, 981 (3d Cir.1997) (reversing summary judgment on plaintiff's § 1983 retaliation claim for same reasons that the court reversed summary judgment on plaintiff's Title VII retaliation claim; court determined that factual issues existed regarding defendant's motivation for terminating plaintiff).

*Kachmar*, 109 F.3d at 178. At this stage of the litigation, the plaintiff must proffer circumstantial evidence sufficient to raise the inference that plaintiff's protected activity was the likely reason for the adverse employment action. *Id.* at 1377; *see also Farrell v. Planters Lifesavers Co.*, 22 F.Supp.2d 372 (D.N.J.1998) (to establish the requisite causal connection, plaintiff must proffer evidence "sufficient to raise the inference that her protected activity was the likely reason for the adverse action"). A plaintiff may not normally satisfy his or her burden in that regard by simply pointing to the fact that an adverse employment action occurred after engaging in protected conduct.[3] *See Robinson*, 120 F.3d at 1302 (explaining element of causation in Title VII retaliation context). However, temporal proximity in addition to other evidence of discrimination may establish the required causal link between the protected activity and the adverse employment action. *Farrell*, 22 F.Supp.2d at 392 (citing *Kachmar v. SunGard Data Sys.*, 109 F.3d 173 (3d Cir.1996)).

■ Plaintiff may meet his burden, for example, if he demonstrates a pattern of harassment during the relevant time period. *See, e.g., Woodson v. Scott Paper*, 109 F.3d 913, 920 (3d Cir.1997). The Third Circuit has instructed that a plaintiff can establish a causal link between his or her protected behavior and subsequent adverse employment action if the employer engaged in a pattern of antagonism in the intervening period. *Id.* at 920–21. Dis-

trict courts should examine the intervening time period following the protected conduct and the adverse action for other evidence of retaliatory animus. *Farrell*, 22 F.Supp.2d at 393. In this connection, we must determine whether the evidence presented is sufficient "based upon the whole picture." *Woodson*, 109 F.3d at 921.

### A. Plaintiff's Failure to Promote Claim—Count I (42 U.S.C. § 1983)

Defendant moves for summary judgment on plaintiff's failure to promote claim, arguing that plaintiff cannot demonstrate that the decision to promote Menendez over plaintiff was motivated by plaintiff's involvement in HISPAC. Defendant similarly contends that he has established that he would not have promoted plaintiff even in the absence of his HISPAC-related activities, as Menendez was simply the better candidate for the job.

Initially, we note that with respect to this claim, the second element of plaintiff's retaliation claim is not in dispute. The second element requires the plaintiff to predicate his or her retaliation claim upon an "adverse employment action." Count I is premised upon defendant's failure to promote plaintiff, which is a sufficient adverse action under the circumstances.

The causation element of the plaintiff's retaliation claim is contested by the defendants. Plaintiff makes much of the temporal proximity between plaintiff's HISPAC-related activities and the failure to pro-

---

**3.** The Third Circuit in *Robinson* discussed an apparent intra-circuit split which had developed on the issue of whether temporal proximity between the protected conduct and the adverse action, standing alone, could support an inference regarding defendant's motivation. *Robinson*, 120 F.3d at 1302. In reviewing prior Third Circuit precedent, the court suggested that the circuit's holding in *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) should be limited to its facts. *Id.* (noting that *Jalil* presented exceptional circumstances because plaintiff was terminated two days after engaging in protected activity). Two months later in *Krouse*, the Third Circuit cited *Jalil* as an example of a case where the timing of the

retaliatory action (two days after the employee filed an EEOC complaint) was unusually suggestive. *Krouse*, 126 F.3d at 503. We understand the holdings in *Robinson* and *Krouse* to indicate that temporal proximity, standing alone, may support an inference of causation, but only where the facts presented in the particular case are "unusually suggestive of retaliatory motive." *See Farrell*, 22 F.Supp.2d at 392 (finding that three to four week interval between protected conduct and adverse action was not "unusually suggestive of retaliatory motive," and thus required plaintiff to adduce additional evidence regarding the causation element).

mote. (Pl.'s Br. in Opp'n at 23–26.) Particularly, plaintiff points to Torres's reprimand concerning plaintiff's use of an early lunch hour on April 21, 1997 to attend the HISPAC conference convened because of Torres's dismissal of the HISPAC administrative complaints. He also asks us to review the pattern of conduct leading up to the promotion determination. Plaintiff begins by relying upon certain statements by Torres allegedly made beginning in or about 1987 which demonstrates defendant's hostility to HISPAC. Particularly, plaintiff relies upon statements allegedly made by Torres indicating that plaintiff was "a troublemaker," "in hot water" and "crazy." (*Id.* at 28.) Plaintiff also points to various statements made by defendant upon plaintiff's return from leave in October 1996, to the effect that Torres was unsure how plaintiff would fit into the new employment structure, and was inquiring about how much longer plaintiff intended to stay employed at DCR. (*Id.* at 31; Rodriguez Dep. II at 128–30.)

Plaintiff also relies on the fact that upon plaintiff's return from administrative leave, Torres "took away all of plaintiff's responsibility" and "gave him projects that were far below his competence level." (Pl.'s Br. in Opp'n at 33.) Similarly, plaintiff claims that upon his return, defendant did nothing to attempt to incorporate plaintiff into the DCR structure, and failed to provide plaintiff with a timely performance assessment review ("PAR") which would define plaintiff's duties and responsibilities. (*Id.* at 34.) Plaintiff thus claims that defendant was setting plaintiff up for failure upon his return to DCR in 1996–97.

We have reviewed the evidence which plaintiff claims demonstrates a causal connection between his protected conduct and the adverse decision regarding the promotion. Moreover, we recognize that defendant has presented evidence which demonstrates that in his view, which was confirmed by others,[4] Menendez was the better candidate. However, viewing the evidence in the light most favorable to plaintiff, as we must at this stage, we conclude that the totality of the circumstances leading up to defendant's decision regarding the Administrative Analyst 1 position precludes summary judgment on plaintiff's failure to promote-retaliation claim.

For example, we note that plaintiff has presented evidence which could be construed by the fact-finder as proof of a "pattern of antagonism" towards plaintiff during the relevant time period. *Cf. Farrell*, 22 F.Supp.2d at 393 (noting that plaintiff offered no evidence to suggest a pattern of antagonism or of retaliatory motive that could give rise to an inference of retaliation). The record demonstrates Torres's displeasure with plaintiff's unilateral decision to take an early lunch hour for the purpose of attending a HISPAC gathering during business hours. While we recognize that defendant proffered a reason for his determination that plaintiff would have to use vacation time for his attendance at the HISPAC gathering at the State House, the peculiar facts of this case could support an inference that Torres's decision in that regard was motivated for reasons other than state policy. Put simply, it is undisputed that the purpose of the gathering at the State House was in response to Torres's dismissal of the HIS-

---

4. Defendant also argues in this connection that plaintiff's failure to promote claim is without merit because the two individuals who interviewed plaintiff for the position but recommended Menendez were unaware of plaintiff's HISPAC-related activities, or if they were aware of them, supported plaintiff's efforts in that regard. Defendant maintains that plaintiff must establish that the persons who took the adverse employment action against him knew of the protected activity. *See, e.g., Farrell,* 22 F.Supp.2d at 390 (citing *Gemmell v. Meese,* 655 F.Supp. 577, 582 (E.D.Pa.1986)). However, this rule of law is inapposite here, as the ultimate decisionmaker regarding the promotion was Torres. It is undisputed that Torres was aware of plaintiff's involvement with HISPAC at the time the decision was made.

PAC complaints. Not coincidentally, the date of the gathering was the date that HISPAC filed its appeal of DCR's decision to the Appellate Division.

We also note that just prior to the commencement of the interview process for the Administrative Analyst 1 position, Torres and Menendez met to discuss their perceived problems with plaintiff's work. While the record demonstrates that plaintiff was having problems completing the work assignments given by Menendez, it appears that plaintiff's role or employment position at DCR at that time was undefined in terms of goals and job responsibilities. For example, it is undisputed that plaintiff did not have a PAR upon his return from leave. Plaintiff explains that a PAR is a job performance plan that is developed jointly by the employee and his or her supervisor and includes work assignments and measurable performance standards. Once the PAR is developed, at the end of six months and at the end of the year, the employee and the supervisor will review the employee's performance. The supervisor will issue an interim rating at the end of six months and a final rating at the end of the year. Plaintiff indicates that when there is a change in job assignment or supervisor, a new performance plan is supposed to be prepared. (Pl.'s Br. in Opp'n at 35 (citing N.J.A.C. § 4A:6–5.2).)

Here, plaintiff claims that he was at a disadvantage because he was unsure of where he fit into the DCR's new structure. Torres has provided an explanation for the failure to provide a PAR upon plaintiff's return. However, viewed in conjunction with Torres's statements to plaintiff upon his return from leave, there is a factual question as to defendant's reasons for his treatment of plaintiff upon plaintiff's return. A jury could conclude that defendant's conduct and statements were indicative of his belief that plaintiff had intended to leave DCR to obtain employment in Arizona. Alternatively, a jury could infer from these circumstances that defendant

had a preconceived notion about plaintiff's future at DCR which was informed in part by plaintiff's HISPAC-related activities. What is clear, however, is that plaintiff's job was different upon his return and that Torres expressed dissatisfaction with plaintiff's performance just prior to his decision regarding the promotion. We decline to speculate on the outcome of the factual inquiry; suffice it to say that it is one for the jury and not the Court, provided that there is sufficient evidence presented at trial from which a jury could conclude that defendant's decision regarding the promotion to Administrative Analyst 1 was undertaken in retaliation for plaintiff's HISPAC-related speech and conduct.

Our review of the totality of the evidence presented informs us that there is enough circumstantial evidence to present to the jury on the issue of defendant's motivation in selecting Menendez over plaintiff. We cannot say that the record is devoid of facts from which a jury could conclude that plaintiff's association with HISPAC and his HISPAC-related speech and activities were a substantial or motivating factor in defendant's conduct. Similarly, we believe that whether defendant has proven that he would have chosen Menendez despite plaintiff's conduct and/or speech is a factual issue for the jury to resolve. Therefore, we will deny defendant's motion on Count I.

B. Plaintiff's "Hostile Work Environment Claim"—Count II (42 U.S.C. § 1983)

Plaintiff has alleged that Torres engaged in a pattern of harassment in retaliation for plaintiff's HISPAC-related speech and conduct. Plaintiff maintains that the pattern of conduct at issue demonstrates that defendant created a "hostile work environment" for plaintiff at DCR, and that defendant's conduct in creating that environment is actionable under 42 U.S.C. § 1983, apart from any claim with respect to the failure to promote plaintiff

to Administrative Analyst 1. Thus, we understand plaintiff's claim to be that the defendant's creation of a "hostile work environment" amounts to an "adverse employment action" which was undertaken in retaliation for plaintiff's First Amendment protected speech and conduct.

Plaintiff states that his hostile work environment § 1983 claim, which we will refer to as a claim for "retaliatory harassment,"[5] is predicated upon a series of events while employed at DCR involving conduct by Torres towards plaintiff. We understand plaintiff to assert the following evidence in support of his retaliatory harassment charge, at least at this stage of the proceedings: (1) upon plaintiff's return from leave in October 1996, plaintiff's work responsibilities were different than before he left, and his responsibilities were reduced,[6] (*see* Pl.'s Br. in Opp'n at 34); (2) Torres made statements to plaintiff upon his return from a leave of absence concerning plaintiff's future at DCR;[7] (3) Torres failed to provide plaintiff with a PAR upon his return from leave, which left plaintiff unsure of his job responsibilities, (*see* Pl.'s

5. As will become evident from our discussion of the relevant legal principles, the cause of action which plaintiff appears to assert is one of "retaliatory harassment" rather than one based upon a "hostile work environment" as we understand that latter phrase to be utilized by the courts. We have been unable to find any case law which describes the nature of plaintiff's retaliation claim in this First Amendment/public employee context as a claim for a "hostile work environment" under § 1983. Accordingly, we will use the term "retaliatory harassment," as we believe that it appropriately describes the nature of plaintiff's claim.

6. Plaintiff testified that upon his return from leave, Torres told plaintiff that he would be working part-time for Katrina Wright and part-time for Torres. (Rodriguez Dep. II at 131–32.) Plaintiff was reassigned because his prior job responsibilities were being performed by Menendez as a result of the restructuring which was undertaken while plaintiff was on leave. Plaintiff was also assigned two projects to complete for Menendez. Plaintiff's performance of those projects was the subject of the May 29, 1997 meeting.

Plaintiff also certifies that after the HISPAC appeal was filed, his work assignments decreased "substantially." (Rodriguez Decl. ¶ 6.) He states in this connection that "[d]ays went by when [he] was not given any work to do at all." (*Id.* ¶ 11.)

Defendant maintains that despite the fact that plaintiff's job responsibilities changed, he actually received a raise upon his return from leave. (*See* Def.'s Br. in Supp. at 10; Rodriguez Dep. II at 81–83.) Defendant also argues that we should disregard plaintiff's attempt to inject plaintiff's decrease in work assignments as a component of this claim. (Def.'s Reply Br. at 5.) Defendant contends that plaintiff's declaration is inconsistent with prior deposition testimony where plaintiff outlined the components of this claim. Defendant cites a number of cases which indicate that the district court may disregard a non-movant's affidavit if it contradicts earlier testimony without a satisfactory explanation for the discrepancy.

We are not inclined to limit the components of plaintiff's retaliatory harassment claim to those identified in plaintiff's deposition testimony. While we recognize that plaintiff testified at deposition that there were no other components of his harassment claim apart from those identified at that time, (*see* Rodriguez Dep. II at 144), we find the cases cited by defendant distinguishable. The courts in those cases were faced with a situation where the plaintiff had testified to a fact at deposition and later tried to recant his or her factual testimony with an affidavit submitted in opposition to a summary judgment motion. *See, e.g.*, *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991) (issue was date plaintiff had knowledge of fact for statute of limitations purposes); *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir.1988) (issue was dates that patient took drug which plaintiff claimed caused birth defects). Here, the deposition testimony at issue is not conflicting fact testimony in the same sense as the testimony presented in the cases relied upon by defendant.

7. Plaintiff testified at his deposition that upon returning from his leave of absence on October 15, 1996, Torres met with plaintiff to describe to plaintiff the various changes in DCR management structure that defendant was beginning to implement. (Rodriguez Dep. II at 128–130.) Plaintiff stated that Torres also asked him how much longer plaintiff intended to remain in New Jersey and in his job at DCR. (*Id.* at 130.) Plaintiff next testified that Torres told plaintiff that it would be "better for plaintiff to consider placement someplace else, another agency within the Department of Law and Public Safety." (*Id.*)

Br. in Opp'n at 35–36); and (4) certain other supervisors at DCR interacted differently with plaintiff upon his return from leave. (*See* Rodriguez Dep. II at 114–16).

Defendant argues that plaintiff's retaliatory harassment claims under § 1983 must be dismissed for the following reasons: (1) the evidence which plaintiff relies upon in support of his retaliatory harassment claims cannot support such a cause of action as a matter of law, as there is no proof of an "adverse action" by defendant as that term is defined under Title VII jurisprudence,[8] (Def.'s Br. in Supp. at 30); (2) plaintiff's claims are based upon his protected speech rather than his protected class, whereas most hostile work environment claims are premised upon the theory that the plaintiff was subjected to discriminatory conduct because of his or her protected characteristic, (*id.*); (3) plaintiff has no evidence demonstrating that Torres was hostile towards plaintiff; and (4) plaintiff is entitled to qualified immunity because it is not clearly established that a hostile work environment claim may be predicated upon "reprisal rather than protected status," nor is it clearly established that a hostile work environment claim not involving "tangible employment actions" can meet the prima facie requirement that plaintiff suffered some "adverse action." (*Id.* at 38.)

Our analysis must begin by setting forth the relevant First Amendment jurisprudence concerning claims of retaliatory harassment arising under 42 U.S.C. § 1983. We will utilize those legal principles to guide our analysis of the qualified immunity issue raised by the defendant. *See Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.") (citations omitted).

### 1. Applicable Legal Principles

Essentially, we understand this claim to be predicated upon certain conduct by Torres which plaintiff contends amounted to a pattern of harassment. Plaintiff asserts that defendant engaged in the objectionable conduct because of plaintiff's involvement in HISPAC and his speech related to his association with that group. As we have already indicated, both parties agree that plaintiff's HISPAC-related activity is First Amendment protected speech and conduct. The parties dis-

8. One of the elements of a retaliation claim both under § 1983 and Title VII is that the plaintiff suffered an "adverse employment action." Both parties assume that the law with respect to the meaning of "adverse action" which has developed in the Title VII retaliation jurisprudence applies where the plaintiff's retaliation claim is premised upon an alleged interference with free speech and association rights protected by the First Amendment through 42 U.S.C. § 1983. Defendant cites *Robinson* in support of his contention that the law regarding the meaning of the phrase "adverse employment action" is analogous under both Title VII and First Amendment jurisprudence.

Our problem with defendant's interpretation of the scope of the court's holding in *Robinson* is that it is not clear from that opinion whether plaintiff's § 1983 retaliation claim was predicated upon an alleged infringement of plaintiff's First Amendment rights. The only statement regarding the basis for plaintiff's § 1983 retaliation claim is the following: "[Plaintiff] also sued [individual defendants] Buford and Edwards for retaliation under § 1983, apparently for violating her right, secured by the same provision of Title VII, to protest discrimination." *Robinson*, 120 F.3d at 1299. We of course recognize that plaintiff's right to petition the courts (and EEOC) for redress is entitled to First Amendment protection which, if violated, would be actionable under § 1983. *See Anderson*, 125 F.3d at 161. However, we are unwilling to assume that the plaintiff's § 1983 retaliation claim in *Robinson* was grounded in the First Amendment without a clearer understanding of the legal underpinnings for the *Robinson* plaintiff's § 1983 claim, for fear of oversimplifying the matter and applying the incorrect standard in the First Amendment retaliation context. Moreover, for purposes of the qualified immunity analysis which we find dispositive here, *see infra*, *Robinson* is inapposite because it was decided after the alleged retaliatory conduct at issue took place.

agree, however, on the issue of whether and under what circumstances a pattern of harassing conduct in response to plaintiff's protected speech or association may support a § 1983 retaliation claim where the plaintiff has not suffered any tangible adverse employment consequences such as, for example, a demotion, termination, reduction in pay, loss of promotion or transfer.[9]

We disagree with defendant's initial premise that in theory, plaintiff could not pursue a claim for retaliatory harassment under § 1983 predicated upon First Amendment protected speech and/or conduct where plaintiff's alleged injury is something short of an employment action such as termination, demotion, transfer, or loss of promotion. Moreover, we disagree with defendant's wholesale reliance upon Title VII jurisprudence, as we have uncovered cases arising in this context outside of this circuit which have not looked to Title VII as the relevant guidepost in determining the types of retaliatory conduct by an employer which would give rise to a cause of action for retaliation brought by a public employee under § 1983.[10] While it appears that at least at the time that defendant acted, the Third Circuit had not squarely addressed either of these issues, it is necessary to review how the Third Circuit Court of Appeals has interpreted the scope of First Amendment protection which should be afforded to a public employee who is alleging that he or she has been subjected to retaliation. From these cases, we gain a clearer understanding of the types of employer conduct which could give rise to a cause of action under § 1983.

We begin with the circuit's decision in *Bennis v. Gable*, 823 F.2d 723 (3d Cir. 1987). There the court addressed whether a plaintiff could pursue a First Amendment retaliation claim under § 1983 for an alleged demotion due to the plaintiff's political patronage. This case was decided prior to the Supreme Court's decision in *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), which extended the First Amendment retaliation jurisprudence to employer decisions such as hiring, rehiring, transfers and promotions. Defendants argued that they had not violated the plaintiffs' rights because they demoted rather than terminated plaintiffs. The Third Circuit reviewed the Supreme Court's opinions in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The court rejected the defendants' position that those precedents should not be extended to the demotion context, holding as follows:

> Although *Pickering, Elrod,* and *Branti* each involved dismissals from employment, the rationale of each dealt with the constitutionality of action adversely affecting an interest in employment in retaliation for the exercise of First

---

**9.** Plaintiff's Amended Complaint asserts a claim for the failure to promote him to Administrative Analyst 1 separate and apart from his allegation of retaliatory harassment. We have discussed the viability of plaintiff's failure to promote retaliation claim in Part I.,A., *supra.* Our research has revealed that the majority of the Third Circuit cases addressing First Amendment reprisal claims have been predicated upon tangible adverse consequences by the employer, i.e., termination, demotion, transfer, failure to promote, and/or formal reprimand. *See, e.g., Fultz,* 165 F.3d at 218–19 (miscalculation of seniority); *Swineford v. Snyder Cty. Pa.,* 15 F.3d 1258 (3d Cir.1994) (termination); *Bennis,* 823 F.2d 723 (demotion).

**10.** The issue is not one of semantics, however, as it is clear that a Title VII retaliatory harassment claim will lie only where the harassment is severe enough to rise to the level of a substantive violation of Title VII. *See Robinson,* 120 F.3d at 1301. Those cases addressing the issue in the First Amendment retaliation context have adopted a different standard, namely, whether the harassing conduct which is alleged to have occurred was such that it would likely deter a person of ordinary firmness from the exercise of his or her First Amendment rights. *See infra.* Theoretically, it could be that certain conduct would violate the latter standard without offending the former.

Amendment rights. *As we read those cases, the constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible speech.* The first amendment is implicated whenever a governmental employee is disciplined for his speech. *Id.* at 731; *see also Rappa v. Hollins,* 991 F.Supp. 367, 377 (D.Del.1997) (noting the Third Circuit's approach in *Bennis* is an attempt to interpret the meaning of Supreme Court precedent in determining what constitutes retaliation for purposes of First Amendment).

Similarly in *Bradley v. Pittsburgh Board of Educ.,* 910 F.2d 1172 (3d Cir.1990), the circuit addressed a retaliation claim brought by a governmental employee against her employer under § 1983. The gravamen of the plaintiff's retaliation claim was that the defendants engaged in a pattern of harassment in retaliation for the plaintiff's exercise of her First Amendment rights. The plaintiff, a schoolteacher, alleged that the defendants engaged in a series of acts in retaliation for plaintiff's advocation of a classroom management technique called "Learnball." *Id.* at 1174. Plaintiff claimed, for example, that defendants had interfered with her relationship with students, criticized her in front of her students, falsely accused her of violence and using abusive language, had engineered an attack on her by a parent, and refused to transfer her to another school upon her request. *Id.* at 1178. Plaintiff sought injunctive relief in the district court, which the court denied. Plaintiff appealed that ruling to the Third Circuit. The appeals court, in addressing the propriety of the district court's denial of the injunctive application without an evidentiary hearing or written factual and legal findings, stated the following regarding plaintiff's First Amendment retaliation claim:

> [Plaintiff] also argues that defendants have engaged in a pattern of harassment which is a conscious effort to punish and restrict her First Amendment activity *outside* the classroom by curtailing her activities which symbolize her First Amendment activities inside the classroom. If the evidence sustains this claim, it would show conduct that violates [plaintiff's] First Amendment rights.

*Id.* at 1177 (emphasis in original).

We find additional support for the assertion that a pattern of retaliatory harassment can, under certain circumstances, support a cause of action under § 1983 in *Trotman v. Board of Trustees of Lincoln Univ.,* 635 F.2d 216, 228 (3d Cir.1980). There the theory of the plaintiffs' case against the defendants was that they were subjected to harassment and certain defined adverse employment actions as a result of the exercise of the plaintiffs' First Amendment rights to criticize certain policies and management of the University. Plaintiffs thus sued under 42 U.S.C. § 1983, alleging that the defendants engaged in a pattern of conduct which chilled the plaintiffs' exercise of their First Amendment rights. Specifically, the plaintiffs' claims of retaliation were predicated upon the following allegedly objectionable conduct: (1) certain implicit and explicit threats of potential future disciplinary action directed towards plaintiffs should they engage in picketing or certain speech critical of the president, and (2) certain administrative or personnel actions such as terminations, failure to promote and failure to grant tenure to faculty members who were outspoken and critical of the administration of the university. (*Id.* at 226 & 229).

The district court granted defendants' motion to dismiss at the close of the case. The Third Circuit reversed and remanded the case for a new trial. In the course of its opinion, the court addressed the plaintiffs' argument that they had presented sufficient evidence showing that defendants' alleged retaliatory conduct infringed upon plaintiff's exercise of free speech rights. In that regard, the court of appeals noted the following with respect to the type of employer conduct which could

serve to chill one's exercise of First Amendment rights:

> The trial court repeatedly refused to allow plaintiffs and other faculty members to testify about their own chill and the inhibiting effect of defendants' actions. In *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the Court stated that "In recent years this Court has found in a number of cases the constitutional violations may arise from the deterrent, or chilling effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights.... The Court has also noted that the 'threat of sanctions may deter (the exercise of First Amendment rights) almost as potently as the actual application of sanctions.' "
>
> . . . .
>
> The evidence introduced by plaintiffs and that which they were prevented from introducing supported or would have been relevant to their claim of specific present objective harm.... Since evidence of chill would be relevant to plaintiffs' claim that defendants' activities did in fact result in an unconstitutional restraint on protected speech and conduct, the court erred in excluding plaintiffs' proffered evidence.

*Id.* at 228. The court instructed that on remand, the trier of fact should take into account "the totality of the conduct alleged." Otherwise, the court noted, "an analysis of each discrete allegation without considering the impact of all of the facts and circumstances in combination would overlook the proverbial forest from the trees." *Id.* at 229.

While we recognize that the objectionable conduct forming the basis of plaintiffs' harassment theory in *Trotman* included tangible adverse employment actions such as termination and involuntary retirement, the tenor of the court's opinion demonstrates its approach to analyzing the question of whether particular employer conduct could support a cause of action for retaliation. Particularly instructive was the circuit's direction to the district court to consider the totality of the circumstances proffered by the plaintiffs in determining if they had made out a First Amendment violation on remand. Moreover, the circuit's focus on the relevance of the evidence which demonstrated the potential chilling effect of defendants' conduct supports our conclusion that such an inquiry informs our determination of the types of retaliatory employer conduct which could form the basis for a First Amendment retaliation claim.

Most recently, the court in *Anderson v. Davila*, 125 F.3d 148 (3d Cir.1997) addressed plaintiff's claim of retaliation where the alleged retaliatory conduct did not involve a tangible adverse employment decision against the plaintiff such as demotion, firing, termination or failure to promote. In *Anderson*, the plaintiff filed a EEOC charge against his employer, alleging that the employer engaged in unlawful racial discrimination. The local newspaper published a story about the plaintiff's claim which contained negative statements by the plaintiff concerning the pattern of discrimination directed at him by his employer. Shortly thereafter, defendants commenced an extensive investigation of the plaintiff and his attorney. The investigation included visual surveillance, photographs, and the institution of a criminal background check.

The Third Circuit stated that a plaintiff can establish a retaliation claim under the First Amendment if he was "denied a benefit simply because he exercised his First Amendment rights." The court explained that "Although *Mt. Healthy* is most often applied in employee dismissal cases, many courts have expanded *Mt. Healthy*'s doctrine to different types of official retaliation." *Id.* at 163 (citing cases). The court continued: "In this case, [plaintiff] was denied the benefit of initiating litigation without the harassment of otherwise uncalled for surveillance, simply because he filed a potentially vexatious lawsuit against his former employers. This type of retali-

ation falls squarely within the *Mt. Healthy* line of cases." *Id.*

We note finally that we also have reviewed the Supreme Court's opinion in *Rutan*, and find certain of the majority's statements instructive on the issue of whether a campaign of petty harassment could, in total, give rise to a claim of retaliation under § 1983. In *Rutan*, 497 U.S. at 78–79, 110 S.Ct. 2729, the Court extended the *Elrod/Branti* principles to government employment decisions concerning hiring, promotion, transfer, and recall of public employees based upon political affiliation and support. It is clear from a reading of *Rutan* that the Court was concerned with "deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy." [11] *Id.* at 75, 110 S.Ct. 2729. While the Court did not address the precise question presented on these facts, we find the Court's focus upon the potential chilling effect of the employer's action instructive in deciding the realm of potential employer conduct which could, if established, give rise to a claim in this context.

Our review of these cases indicates that while the majority of the Third Circuit decisions have analyzed retaliation claims based upon tangible adverse employment consequences, the court's precedent cannot be read to preclude a claim for retaliatory harassment even where the plaintiff's claim is predicated upon conduct apart from any decision regarding the plaintiff's job status such as, for example, termination, demotion, or the denial of a promotion. Based upon the discussions in *Bennis, Bradley, Trotman* and *Anderson* concerning the scope of First Amendment protection against retaliatory ·conduct, we conclude that there is support in the jurisprudence of this circuit for the proposition that retaliatory harassment could, under certain circumstances, constitute an "ad-

verse employment action" which is actionable under the rubric of a First Amendment retaliation cause of action. While none of those cases involved the specific types of conduct at issue here, they support the general conclusion which plaintiff advocates, namely that the theory of liability for· retaliatory harassment under § 1983 exists.

The issue remains, however, as to the nature of the harassment which must be demonstrated by the plaintiff to sustain a claim of retaliatory harassment under § 1983. As the Seventh Circuit noted in *McDonnell v. Cisneros*, 84 F.3d 256, 259 (7th Cir.1996), "how serious the adversity need be is a separate question, also difficult." Here, the gravamen of the plaintiff's claim is that the various statements made by Torres and the changes in his circumstances of employment together form sufficient "adverse action" to support a retaliation claim under § 1983. However, none of the circuit precedent cited above discussed retaliation claims presented under the same or similar factual predicate. Accordingly, once we have determined (as we have) that a plaintiff/public employee may pursue a claim under § 1983 for retaliatory harassment in this circuit, the question becomes the level of harassment which could give rise to such a claim. Because of the apparent dearth of Third Circuit precedent informing our analysis on this point, we have reviewed opinions from other circuit courts of appeal, and will now briefly summarize those guiding principles below.

The first case attempting to delineate the types of conduct sufficient to support a retaliatory harassment claim was the Seventh Circuit's opinion in *Bart v. Telford.* The plaintiff in *Bart* was a city employee who took a leave of absence from her position to run for mayor. After she lost the race, she returned to her position with

---

**11.** The Court rejected the Seventh Circuit's view of the appropriate constitutional standard, which proposed that only those employment decisions that are the "substantial equivalent of a dismissal" violated the employee's rights under the First Amendment. *Rutan,* 497 U.S. at 75, 110 S.Ct. 2729.

the city. Plaintiff claimed that the defendants, including the incumbent mayor, subjected plaintiff to a "campaign of petty harassments" in retaliation for plaintiff's exercise of her First Amendment rights. The plaintiff claimed that the harassment campaign included such things as baseless reprimands and "holding her up to ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee although the practice was common and was especially favored." *Bart,* 677 F.2d at 622. The court reversed the district court's 12(b)(6) dismissal of this claim, stating "we cannot say as a matter of law that the exercise of First Amendment rights by public employees cannot be deterred by subjecting employees ... to harassment and ridicule." Judge Posner explained its holding as follows:

> The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable. Yet even in the field of constitutional torts de minimis non curat lex.... It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise.... However, more is alleged here—an entire campaign of harassment which though trivial in detail may have been substantial in gross.

The court explained that the determination of whether the alleged acts of harassment were likely to deter a person of ordinary firmness from the exercise of his or her First Amendment rights is a question of fact. *Id.* at 625.

Since the Seventh Circuit's decision in *Bart,* other circuit courts have adopted the court's standard regarding the threshold of actionability for the alleged acts of harassment under § 1983—namely that the plaintiff, in order to recover, must demonstrate that the conduct alleged to have occurred was such that it would likely deter a person of ordinary firmness from the exercise of his or her First Amend-

ment rights. *See, e.g., Colson v. Grohman,* No. 97–41388, 1999 WL 246726 (5th Cir. Apr.26, 1999) (affirming trial court's grant of summary judgment to defendants on plaintiff's retaliatory harassment claim under § 1983; court found that defendants' efforts to have plaintiff, a city counsel member, investigated, prosecuted, humiliated in public, and recalled from her position did not rise to level of harassment sufficient to support a retaliatory harassment claim); *Thaddeus–X v. Blatter,* 175 F.3d 378, 396 (6th Cir.1999) (en banc) (in the context of a prison retaliation First Amendment case, court adopted Seventh Circuit's standard in *Bart* to analyze whether the alleged retaliatory harassment inflicted upon a prisoner was sufficiently "adverse" to constitute an adverse action, which is an element of a First Amendment retaliation case); *Crawford–El v. Britton,* 93 F.3d 813, 826 (D.C.Cir. 1996) (en banc) (same), *rev'd on other grounds,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Levin v. Harleston,* 966 F.2d 85, 89 (2d Cir.1992) (where plaintiff, a professor at City University of New York, alleged that defendants retaliated against him for his speech by threatening discipline and also forming "shadow" class which students could opt into instead of remaining in plaintiff's class, court found that plaintiff demonstrated a "judicially cognizable chilling effect" on his First Amendment rights); *Agosto–de–Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1217 (1st Cir.1989) (en banc) (adopting standard for retaliation claims short of dismissal or other tangible adverse employment consequences which permits plaintiff to pursue retaliation claim when the employer's challenged actions result in a work situation "unreasonably inferior" to the norm for the position); *see also Hutt v. Alford,* No. 96–384, 1997 WL 158205, at *3–4 (E.D.Pa. Mar.27, 1997) (finding that plaintiff could not state First Amendment retaliation claim because she made no showing of an "adverse employment action;" court stated that "complained-of [employer] action must be sufficiently adverse to create an actual

or potential chilling effect on the employee's protected speech") (citing Seventh Circuit case law); *DeLeon v. Little*, 981 F.Supp. 728, 733 (D.Conn.1997).

■ These cases have attempted to answer the "difficult question" of the level of adversity the plaintiff must experience in order to sustain a cause of action for retaliatory harassment against a public employer. In the absence of any clearly applicable Third Circuit precedent to the contrary, we find that the standard set forth in *Bart* and its progeny represents a useful and appropriate gauge of employer conduct in the public employee/First Amendment context, given the nature of the plaintiff's right at issue. Accordingly, we find that a plaintiff may state a cause of action for retaliatory harassment under § 1983 if the court determines that the alleged acts of harassment, when viewed in their totality, are likely to deter a person of ordinary firmness from the exercise of his or her First Amendment rights.

### 2. Qualified Immunity Analysis

Against this backdrop of legal precedent, we must determine whether defendant is entitled to qualified immunity based upon his argument that it was not clearly established as of the relevant time period that plaintiff could pursue a cause of action for retaliatory harassment under the First Amendment under the circumstances presented here. Our analysis will view the facts presented by plaintiff in the light most favorable to him, as we are addressing the issue of qualified immunity in the context of a motion for summary judgment.

■ The focus of the qualified immunity inquiry is on the "objective legal reasonableness" of the actions taken by the public official. *See Pro v. Donatucci*, 81 F.3d 1283, 1286 (3d Cir.1996). Our analysis of the qualified immunity issue will proceed according to the framework most recently enunciated in the Third Circuit's opinion in *Assaf v. Fields*, 178 F.3d 170, 173 (3d Cir.1999). There the court explained that the proper analytical framework for addressing qualified immunity claims is to ascertain first whether plaintiff's claims make out a violation of a constitutional right. *See Assaf*, 178 F.3d 170, 173; *Siegert*, 500 U.S. at 234, 111 S.Ct. 1789. Only if such a violation is alleged need we proceed to determine whether, in light of clearly established law, the unlawfulness of the defendant's action would have been apparent to a reasonable official. *See Siegert*, 500 U.S. at 234, 111 S.Ct. 1789.

In applying the doctrine of qualified immunity, we must look to what a reasonable public official would have understood from existing law, and our circuit does not require that there be a prior case on all fours on both the facts and the law. *See Pro*, 81 F.3d at 1292; *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (noting that a right may be clearly established even though the action in question has not previously been held unlawful). Our circuit court has stated that the clearly established requirement requires "some but not precise factual correspondence" and demands that officials apply general, well developed legal principles. *See Bennis*, 823 F.2d at 733. Moreover, in *Bieregu v. Reno*, 59 F.3d 1445, 1459 (3d Cir.1995), the Third Circuit noted that "the absence of a previous decision from our court on the constitutionality of the conduct at issue is not dispositive" in determining whether the particular constitutional right at issue was clearly established at a particular time.

Nonetheless, the Supreme Court has admonished that we should not construe the right at issue in overly general terms, "thereby automatically converting any action which violates a constitutional right into an action which violates a clearly established right." *See Rappa*, 991 F.Supp. at 370 (citing *Anderson*, 483 U.S. at 639–40, 107 S.Ct. 3034). If officials of "reasonable competence could disagree on the issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ Our review of the state of the law as it existed during the time that the retaliatory conduct allegedly occurred demonstrates that defendant must be granted immunity on plaintiff's § 1983 retaliatory harassment claim. We begin by noting that plaintiff has satisfied the threshold inquiry in any qualified immunity analysis, namely whether the plaintiff has alleged a violation of a constitutional right at all. The gravamen of plaintiff's First Amendment challenge is that he was retaliated against because of his speech and association with HISPAC, as well as his involvement in the HISPAC litigation and appeal. The general constitutional right to be free from retaliation in response to the exercise of protected First Amendment rights cannot be disputed in this case.

Thus we must focus our inquiry on the apparent lawfulness of defendant's conduct in light of the law as it existed at the relevant time period. We must determine whether "a reasonable official could have believed [defendant's alleged retaliatory conduct] to be lawful, in light of clearly established law and the information" Torres possessed. *See Anderson,* 483 U.S. at 641, 107 S.Ct. 3034; *Abbott v. Latshaw,* 164 F.3d 141, 148 (3d Cir.1998) ("[W]e must decide whether, in light of the concrete, clearly established and particular law applicable on [the date defendants' acted], a reasonable officer would have believed that [defendants' particular conduct] deprived [plaintiff] of his right to procedural due process."). Stated another way, the inquiry must focus upon whether it was apparent that defendant's alleged conduct was unlawful. *Id.; see also Rappa,* 991 F.Supp. at 374 (analyzing state of the law regarding First Amendment retaliation claims in context of plaintiff's claim that defendant's defamatory remarks constituted adverse action taken against plaintiff in retaliation for his political association; court determined that defendant was entitled to qualified immunity because it was not clearly established that defamatory remarks constituted retaliation in violation of the First Amendment).

While the Court finds support in circuit precedent for a § 1983 claim predicated upon a theory of a campaign of retaliatory harassment, *see supra,* that determination does not preclude a finding that the right articulated by the plaintiff was not clearly established as of the time that this defendant acted, and that defendant's conduct was thus objectively reasonable under the circumstances. Based upon our review of the state of the law as it existed as of the time of Torres's alleged retaliatory conduct, we cannot say that it would be apparent to a reasonable official that the complained-of conduct would violate plaintiff's constitutional rights protected by the First Amendment. *See Rappa,* 991 F.Supp. at 375 (reaching same conclusion with respect to plaintiff's First Amendment retaliation claim predicated upon alleged defamatory remarks made by defendant).

We reach this conclusion in light of our understanding of the state of the law at the time that Torres allegedly engaged in the retaliatory conduct. While the Third Circuit decisions discussed above support the conclusion that such a claim would be judicially cognizable in theory, they do not present factual circumstances sufficiently analogous to that presented here such that a reasonable official should have realized that defendant's allegedly harassing conduct (which could fairly be characterized as petty in nature) would impermissibly interfere with plaintiff's First Amendment rights. Our review of the relevant precedent demonstrates that the First Amendment retaliation cases involved employer conduct significantly more "adverse" than the conduct at issue here. Moreover, none of those cases were predicated upon a theory such as that presented by the plaintiff here, namely that the employer engaged in a campaign of harassment which led to the creation of a "hostile work environment."

We recognize that the Seventh Circuit's opinion in *Bart* presents the closest factual analogy with respect to plaintiff's proposed theory of liability. As we have noted, we

may look beyond this circuit to determine if the right articulated by the plaintiff was clearly established, and thus evaluate the objective legal reasonableness of the defendant's conduct in that light. Moreover, we have cited cases adopting the *Bart* court's standard with respect to the level of petty harassment necessary to state a claim under § 1983. However, we do not find that *Bart* or its progeny within the Seventh Circuit would provide a reasonable official with sufficient guidance because as of the time of Torres's alleged retaliatory conduct, the reasoning in *Bart* had been adopted only in the First and Second Circuits in the public employee context, and a review of those cases demonstrates that the facts giving rise to the harassment claim are clearly dissimilar. *See Levin,* 966 F.2d at 89; *Agosto-deFeliciano,* 889 F.2d at 1215; *cf. Zilich v. Longo,* 34 F.3d 359 (6th Cir.1994) (discussing First Amendment retaliation claim where plaintiff, a political opponent of one defendant, alleged he was threatened with physical violence, harassed and vandalized because of his political beliefs; court denied qualified immunity). Moreover, we have only uncovered one district court case within our circuit which permitted a § 1983 retaliation claim predicated upon a campaign of "retaliatory harassment," but the decision was rendered at a point in time which straddles the retaliatory conduct which is alleged to have occurred in this case. *See, e.g., Vearling v. Bensalem Township Sch. Dist.,* 1997 WL 128096, at *7 (E.D.Pa. Mar.18, 1997).

What we are left with after the exhaustive analysis of the relevant precedent is the simple fact that the "required materiality of the retaliatory act is murky." *Rappa,* 991 F.Supp. at 382. Under these circumstances, we conclude that defendant is entitled to qualified immunity on plaintiff's claim of retaliatory harassment brought pursuant to 42 U.S.C. § 1983. We will grant defendant's motion and dismiss Count II of the Amended Complaint with prejudice.

## C. Plaintiff's Pendent State Claims

### 1. Count IV (NJLAD)

Count IV of the Amended Complaint alleges that defendant's conduct articulated in the previous parts of the Amended Complaint violated NJLAD. We presume that plaintiff is attempting to assert violations of NJLAD in connection with plaintiff's assertion of a hostile work environment and failure to promote. We will address each alleged violation separately.

#### a. Reprisal—Failure to Promote Claim

Count IV of plaintiff's Amended Complaint maintains that defendant's retaliatory conduct violates the NJLAD. N.J.S.A. § 10:5–12(d) provides that it shall be unlawful "[f]or any person to take reprisals against any person because he [or she] has opposed any practices or acts forbidden under this act or because he has filed a complaint, testified or assisted in any proceeding under this act."

Defendant argues in connection with plaintiff's NJLAD reprisal claim that there is insufficient evidence concerning the causal connection between plaintiff's protected activity (which with respect to this claim would be the HISPAC litigation) and defendant's failure to promote plaintiff to the position of Administrative Analyst 1. Because NJLAD retaliation claims mirror those asserted under Title VII, *see Lombardi v. Cosgrove,* 7 F.Supp.2d 481, 496 (D.N.J.1997) (sets forth elements of plaintiff's prima facie case for NJLAD retaliation), we will look to Title VII case law for guidance in analyzing the merits of plaintiff's retaliation claim.

Title VII case law and that developed in the First Amendment retaliation context under § 1983 are similar on the issue of what type of evidence demonstrates a factual issue concerning the cause of the adverse employment action taken against the plaintiff. *See Azzaro,* 110 F.3d at 981; *see also Lombardi,* 7 F.Supp.2d at 497 (citing *Romano v. Brown & Williamson Tobacco Corp.,* 284 N.J.Super. 543,

544, 665 A.2d 1139 (App.Div.1995)). For the reasons stated above at Part A, *supra,* we find that the jury must resolve whether defendant's conduct in failing to promote plaintiff was the result of retaliation as plaintiff suggests, or was simply the result of the fact that Menendez was the better candidate for the position. We find that the record presents sufficient factual issues under the governing standards to defeat defendant's motion for summary judgment. *See Cosgrove,* 7 F.Supp.2d at 497.

### b. Reprisal—Hostile Work Environment

Defendant raises the same arguments in connection with plaintiff's retaliatory harassment claim brought under NJLAD as those raised in connection with this theory articulated in Count II of the Amended Complaint under § 1983. Our analysis of the NJLAD retaliatory harassment claim will be guided by the Third Circuit's discussion of what qualifies as an "adverse employment action" under Title VII case law. *See Cosgrove,* 7 F.Supp.2d at 496 (second element of plaintiff's NJLAD reprisal claim is that plaintiff must demonstrate that the employer made an "adverse employment decision" towards her).

The Third Circuit in *Robinson* framed the issue as whether certain allegedly harassing conduct by an employer may, under certain circumstances, constitute an "adverse employment action" such that defendant's conduct could present plaintiff with a cause of action for retaliation under federal law. There the plaintiff brought claims pursuant to § 1983 and Title VII. The court's opinion focused upon the phrase "adverse employment action" as it has developed in the Title VII retaliation context, and determined that oral reprimands and derogatory comments did not rise to the level of an "adverse employment action." *Robinson,* 120 F.3d at 1300–01. The court held as follows: "Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his or her status as an employee.'" *Id.* (quoting Title VII, 42 U.S.C. § 2000e–2(a)(1),(2).) The court explained that not everything that makes an employee unhappy qualifies as retaliation, for "otherwise minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." (citations omitted). Accordingly, the Court held that "the adverse employment action element of a retaliation plaintiff's prima facie case incorporates the same requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e–2(a)(1) or (2)." *Id.*

Here, plaintiff has alleged that defendant's comments upon plaintiff's return from leave, and his conduct towards plaintiff with respect to the change in job responsibilities together constitute an alteration of the terms, conditions, or privileges of plaintiff's employment at DCR. (*See* Pl.'s Br. in Opp'n at 32–34.) While we believe that the comments plaintiff points to are insufficient to demonstrate actionable adverse action standing alone, we conclude that plaintiff's proofs concerning his change in job responsibilities present a factual issue on this point sufficient to require denial of defendant's motion for summary judgment. We cannot say as a matter of law at this juncture that under the governing standard, no reasonable jury could conclude that the conduct at issue, when viewed in toto, did not rise to a substantive violation of Title VII. *Cf. Robinson,* 120 F.3d at 1286 (unsubstantiated oral reprimands and unnecessary comments were too trivial to form basis for retaliation claim; district court made ruling dismissing this aspect of plaintiff's claim upon motion for judgment as a matter of law pursuant to Rule 50); *Mondzelewski v. Pathmark Stores,* 162 F.3d 778 (3d Cir.1998) (reversing summary judgment dismissal of plaintiff's Title VII retaliation claim, finding that plaintiff's allegation that defendants changed his shifts

**354**

amounted to an adverse employment action).

Defendant has not moved for summary judgment on the NJLAD retaliatory harassment claim on any alternative basis. Moreover, our qualified immunity analysis in Part B, *supra* does not apply to this pendent state claim. Accordingly, we will deny defendant's motion for summary judgment on Count IV for the reasons articulated above. Of course, this ruling is without prejudice to defendant's right to move for dismissal of this claim on an alternative basis.

*2. Plaintiff's State Constitutional Claims (Count III)*

Plaintiff also alleges in Count III that defendant's conduct violates the New Jersey Constitution, Article I ¶¶ 6, 18. The Court need not examine plaintiff's claim that his state constitutional rights were violated by defendant's conduct because of our conclusion that plaintiff's claim under NJLAD is sufficient to defeat defendant's motion for summary judgment. Accordingly, we will dismiss Count III without prejudice. *See Lombardi v. Cosgrove,* 7 F.Supp.2d 481 (D.N.J.1997) (applying similar approach to plaintiff's NJLAD and state constitutional claims based upon alleged retaliation because plaintiff filed incident report about supervisor) (citing *Craig v. Suburban Cablevision, Inc.,* 274 N.J.Super. 303, 314, 644 A.2d 112 (1994), *aff'd,* 140 N.J. 623, 660 A.2d 505 (1995)); *cf. Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 863–64 n. 21 (3d Cir.1990) (Becker, J.) (expressing doubt that cause of action for retaliation exists under New Jersey Constitution).

**CONCLUSION**

We have determined that defendant is entitled to summary judgment on Counts II and III of the Amended Complaint. However, plaintiff may pursue his § 1983 retaliation claim premised upon the failure to promote plaintiff to the position of Administrative Analyst 1. (*See* Am. Compl. Count I.) We have also determined that plaintiff may pursue his NJLAD claims based upon plaintiff's failure to promote and retaliatory harassment theories. (*Id.* Count IV.) However, we will dismiss Count II based upon the doctrine of qualified immunity. We will also dismiss the state constitutional claims asserted in Count III of the Amended Complaint.